NELLIE BRAUSE, Appellee, v. REBECCA J. BRAUSE et al.,
Appellants.

**NEW TRIAL:** Excessive Verdicts—Manifest Excessiveness Required.
1  Courts are reluctant to set aside verdicts because of the amounts
thereof. It follows that passion and prejudice on the part of the
jury will not be found unless the amount is so palpably out of pro-
portion to the injury as to shock the conscience. Verdict for $2,000
actual and $1,500 exemplary damages for assault and battery on a
female sustained.

**TRIAL:** Excessive Verdict—Option to Remit. Principle reaffirmed that
2  error in verdict because of excessiveness may be corrected by remit-
titur under optional order of court.

SALINGER, J., concurs specially.

*Appeal from Fayette District Court.*—A. N. HOBSON, Judge.

APRIL 13, 1920.

REHEARING DENIED DECEMBER 20, 1920.

ACTION at law to recover damages for assault and battery
claimed to have been committed by defendants upon the plain-
tiff. Trial to a jury, which returned a verdict in favor of
plaintiff against both defendants for $5,000, which included
$1,500 exemplary damages. The amount of the exemplary
damages was shown by the answer to a special interrogatory,
as to how much exemplary damages were included in the general
verdict. In ruling on defendants' motion for new trial, the
court announced that, unless plaintiff remitted from the verdict
all compensatory damages in excess of $2,000, a new trial would
be granted defendants. Thereupon, the plaintiff remitted all
compensatory damages in excess of $2,000 from the verdict, and
the court overruled the motion for new trial, and rendered judg-
ment against defendants in favor of plaintiff for $3,500. The
defendants appeal.—*Affirmed.*

*W. C. Lewis* and *D. D. Murphy,* for appellants.

*James D. Cooney* and *E. H. Estey,* for appellee.

PRESTON, J.—1. Plaintiff claims that the defendants assaulted and beat her, and that she was injured and damaged thereby. Defendants deny plaintiff's claim, and allege that plaintiff assaulted defendant Myrtle Brause, and that any injuries received by the plaintiff were caused by her own act in provoking the assault, and were necessary to repel the assault of plaintiff. No complaint is made of the instructions, and they are not set out in the record. The errors assigned are as to the sufficiency of the evidence to sustain the verdict against the defendants, and as against defendant Rebecca Jane; that the verdict is excessive, and the result of passion and prejudice; that the court erred in not setting the verdict aside and granting a new trial, and in attempting to correct the same by reducing the amount of damages; that the verdict, after remitting the amount fixed by the court, is still excessive.

Plaintiff is the wife of Rudolph Brause, son of defendant Rebecca Jane Brause and her husband, Dan; the defendant Myrtle Brause is the daughter of Rebecca Jane and Dan, and the sister of Rudolph, plaintiff's then husband. Plaintiff was married to Rudolph in 1910. They lived in West Union from the time of their marriage until 1913, Rudolph carrying on his father's farm near West Union, part of the time. In 1913, plaintiff and her husband moved onto the farm, in a house built by Rudolph under an arrangement with his father. This house was near the house occupied by Dan and his family. At the time of the transaction complained of, plaintiff and her husband and two children, 8 and 4 years of age, were living in the house built by Rudolph, as stated. The trouble in question occurred on the morning of July 10th, after the men had gone to the field. Appellants concede in argument that the evidence as to what happened after the trouble commenced, is conflicting. The defendants' version of the transaction, and of plaintiff's injuries, is substantially as follows: That plaintiff went up to the Dan Brause home to pick some cherries, and met defendant Rebecca Jane Brause, who was washing in front of the house, and she told defendant that she came to get the cherries, and was told that there were no cherries; that the birds had been eating them; and that Myrtle had picked them. Plaintiff was disappointed, and felt as if she ought to have stayed at home.

She then went to the north cornfield for some gooseberries, and on her way back, came again to the Dan Brause house, and asked Mrs. Brause for a carpet which belonged to her. Mrs. Brause told her the carpet was upstairs. Plaintiff started for the carpet, going through the kitchen and hall to go upstairs. Mrs. Brause called after her, saying that she would go and get the carpet, as she knew where it was, and the plaintiff didn't; but plaintiff kept on going, and Mrs. Brause went by her on the stairway and got the carpet from one of the bedrooms and gave it to Nellie, who was then standing at the head of the stairs. She started down ahead of Mrs. Brause, who came on behind, and it seems the talk was not very friendly. Plaintiff stated that it was funny that she had to run up there for everything, and that it was her carpet, and she made mention of a coat which she had missed; whereupon she was asked by Mrs. Brause if she insinuated that they had taken her coat. She said "No;" but that she had missed it for a long time, and had told her husband that morning that she was going to search the whole premises for the coat, if it didn't appear. She had a good deal of feeling about the coat, and that was why she mentioned it. They went down the stairs, out through the kitchen, and met Myrtle, who had then gone outside. Myrtle was in the kitchen when they went upstairs. Words passed between them regarding the coat and other things, and Myrtle called plaintiff a liar, and the fight commenced. Nellie was struck by Myrtle several times, in the face and head and neck, and plaintiff had hold of Myrtle's hair, and was also striking and kicking.

The plaintiff's claim that Rebecca Jane Brause struck her and beat her, and that Mrs. Rebecca Jane Brause struck her when she was coming down the stairs, is denied by the other witnesses; and Mrs. Rebecca J. Brause claims that all she did was to try to get the two women separated, and to loosen Nellie's hands out of Myrtle's hair; and the uncontradicted evidence shows that she was trying to get Nellie's hands loose from Myrtle's hair.

After they separated, Nellie, the plaintiff, and her two children went home, and her sister Bessie and the doctor were called from West Union; and, as a result of the fight, she had a black eye, and the side of her face was contused, and she com-

plained of difficulty in swallowing, and there was an imprint of teeth in her arm, showing tooth marks above the elbow on both sides of the forearm; her face and neck were red, and her hair was snarly and tousled. The affected parts were treated with hot applications and a boracic acid lotion, and the arm washed with alcohol, and painted with a tincture of iodine. A doctor testifies that she was laboring under very much excitement, rather hysterical. She remained in their own house until the next evening, when her sister removed her to her father's home in West Union, where she has since been living, with her two children. There was no further treatment by the physician. He, however, visited her again at her father's house, July 17th. At that time, her face had gone through the ordinary stages of a contused wound, her arm was healed, and the color in her face was absorbed out, just showing green spots here and there through it. He noticed no other injuries, and no complaint was made to him of any other injuries. When the doctor saw her, seven days after the injury, she was practically well, so far as the wounds were concerned. She was a woman of nervous temperament, and had some trouble before,—prolapsus uteri. Plaintiff contends, and the evidence tends to so show, that she is a small, delicate woman, and, at the time of the assault, weighed 110 pounds; and that defendant Myrtle is a strong, healthy woman, who works out, and has cooked at a hotel for a time. At the time of the assault, Myrtle weighed 150 pounds. Rebecca Jane weighed 120 pounds. At the time in question, plaintiff was still the wife of Rudolph.

Plaintiff's version of the transaction is substantially as follows: At the time in question, plaintiff went up past the house of defendants to get some fruit, and, on the way back, stopped at their house to get a carpet which belonged to her. Rebecca J., the mother-in-law, told plaintiff that her carpet was upstairs, and plaintiff said she would go and get it. When plaintiff had gone into the house of defendants, and part way up the stairs for the purpose of getting the carpet, the mother-in-law, Rebecca J., came running after her, passed her on the stairs, got the carpet, and threw it at plaintiff.

Rebecca J. then started to abuse plaintiff, told plaintiff she did not keep her house or her clothes clean; that she was dirty.

She called her vile names, and said plaintiff was running a house of prostitution; that plaintiff was lying around with men; that she had seen plaintiff with Jim Barrett, out in the cornfield, and with others. She called her a bitch and a red-headed devil, and told plaintiff that they were tired of her on that place, and were going to get rid of her. The mother-in-law also told plaintiff at that time that they were not going to let her live on the farm, gave plaintiff a shove with her hand, as if to shove her downstairs, struck plaintiff twice on the back, on the way downstairs, and told plaintiff to get out and stay out.

As soon as the plaintiff and Rebecca J. came downstairs, the defendant Myrtle Brause, sister-in-law of plaintiff, started to make trouble. Plaintiff told these defendants then that she was going to get out of there, go home, and stay away from there, and started to go.

Plaintiff started home with her carpet on her arm, and both of these defendants followed her, calling her names. They called her a bitch, a liar, a dirty old slut, and a red-headed devil; told her she was trying to snare all the men in the neighborhood, including her father-in-law, Daniel Brause. Rebecca J. then grabbed plaintiff by the shoulder and back of the neck, and said:

"Here, Myrtle, let's get after her. We will get rid of her. The two of us will get rid of her right now for good. I will hold her while you pound her until she doesn't know anything."

Then, while Rebecca J. was holding plaintiff, Myrtle commenced slapping her. Plaintiff tried to get away from them, but Myrtle got plaintiff by the neck, and Rebecca J. got plaintiff by the hair, and Myrtle said:

"Hold her until I get my teeth into that face of hers, and I will fix her so she won't be so good-looking."

Myrtle then came at plaintiff with her mouth open, her teeth showing; and plaintiff then thrust her hand into Myrtle's mouth, and held her from biting her. Then Myrtle began pounding plaintiff again on the right side of the face, while Rebecca J. held plaintiff. The defendants were calling plaintiff names, and plaintiff was trying to keep them away. Rebecca J. had hold of plaintiff's hair, and Myrtle was pounding plain-

tiff on the face. Myrtle began to slap plaintiff on the left side of the face, and Rebecca J. said to Myrtle:

"No, don't do that; just keep at one side and pound her until she doesn't know anything,—that is the only way you can do it, and we will have to hurry."

Then Rebecca J. and Myrtle got plaintiff down on her back. Rebecca J. got plaintiff by the knees, and started to drag her. While Rebecca J. had plaintiff by the knees, plaintiff started kicking, and Rebecca J. then let go her hold, went around to plaintiff's head, and tried to get plaintiff's hands out of Myrtle's hair. Plaintiff sprang to her feet then, and tried to go home; but Rebecca J. grabbed plaintiff by the throat and held her. Myrtle then began beating plaintiff again, and Rebecca J. caught plaintiff by the shoulder from behind. Plaintiff could not hold them off, but did hold Myrtle by the hair; while Rebecca J. Brause kept on pounding plaintiff on the back, the back of the neck, back of the head, and behind the ears. Then defendants got plaintiff down again, down on her knees, with her face in the dirt. They kept pounding her on the right side of the face and head, until she could hardly see from her right eye. Rebecca J. got on plaintiff's back with her knee, put her full weight on plaintiff's back, and took plaintiff's head and twisted it around, while Myrtle kept pounding plaintiff all the time. Then Rebecca J. got off from plaintiff, took hold of plaintiff's shoulder, and tried to get plaintiff's hand out of Myrtle's hair. Rebecca J. said she could not make plaintiff let go, and further said, "Maybe I can make her let go;" and then plaintiff felt something on her right arm, something kind of grinding; and then a sickening feeling came over her. Then it went into her arm again. There were teeth marks on plaintiff's arm, where Rebecca J. had bitten her. At this time, plaintiff had her hands in Myrtle's hair, and Myrtle was in such a position that she could not have bitten plaintiff at this time. Then plaintiff tried to get up, but Rebecca J. held her arm, and Myrtle at this time bit plaintiff on the arm. Plaintiff was unconscious, part of the time. Myrtle Brause admits, upon her cross-examination, that she might have bitten plaintiff more than once; that she struck plaintiff not more than a dozen times; that she struck plaintiff in the face; that she had hold of plaintiff's throat; that

she struck plaintiff when plaintiff was down on the ground on her back; that this trouble was going on for a period of about 20 minutes. Plaintiff's little eight-year-old girl was there, with her other little girl, trying to help plaintiff, their mother, by striking Rebecca J. on the back with a stick or club which the child had picked up, when she saw her mother being thrown down and beaten. This child was Isabel, 8 years old. (Defendant Myrtle testifies that Isabel, the little girl, while they were there on the ground, got a club, and hit Rebecca Jane on the back with it; and Rebecca Jane testifies that Isabel got a stick, and went to striking her.) Then they let plaintiff get up from the ground, and she, with her two little girls, started home. When plaintiff got home, the little girl Isabel called plaintiff's sister and the doctor, and plaintiff went to bed. When plaintiff reached her own house, her right eye was swollen almost shut, and her left eye and all of her face was swollen, and there was a mark across her nose and ear. A large amount of plaintiff's hair had been pulled out, and there was dirt over her face and hair, and her clothing was dirty and torn.

Afterwards, plaintiff's face turned a dark purple, and then kind of blue and green. It was this color for about three weeks. Her eyes were black for a long time. There were black and blue marks on her right shoulder, down her side and limbs. There was a bruise on her back and on the back of her neck between the shoulder blades. When plaintiff got home, she could not stand up alone. Her back ached; she could allow no one to touch it. Her whole body ached. The pain was in her back at the time of the trial. She was in bed several days, had to be helped up and down stairs, and could not dress herself. She could not sleep nights, was very nervous, and her hands twitched. At the time of the trial, she could not do housework, her head ached continuously, and she was still taking medicine.

Before this assault, plaintiff did all her own work on the farm; took care of the garden; had from 300 to 500 chickens; did the washing; cared for the hired man; helped with the farm work; helped to sow oats, hitch up colts, plow, plant and take care of the garden; did the cooking, sweeping, and milking; and attended to the milk cans and separator. After the assault, she was unable to do any work, except to help a little with the dishes

at her father's home.  Before the assault, she had been suffering some from female trouble, prolapsus uteri, and after the assault, for about six weeks she could not walk a block without having to go to bed, and, at the time of the trial, if she walked down town from her father's home, she would have to go to bed the next day.  These matters are testified to by plaintiff herself, and with less detail by the little girl, who was present; by her sister; by another party; by a doctor, who saw plaintiff soon after she returned to her own home; and by her father.  Two other doctors testify as to her condition a week or so, after the trouble.  The hired hand testifies that he was at the Brause place, the day the trouble happened, and the days that followed, and saw both defendants around there; didn't notice any marks upon the faces or persons of either defendant.  He also testified for defendants, to the effect that he saw Daniel Brause going to the field with a scythe.  The only other witnesses giving testimony for the defendants were the defendants themselves and Daniel, the husband of Rebecca Jane.  They gave evidence to sustain their version of the affair.  It is thought that plaintiff has exaggerated somewhat.  Interested witnesses do that sometimes, and it is equally true of defendants.  Doubtless they have shaded the testimony in their own favor.  It is clear that there was such a conflict in the evidence that it was a question for the jury; and, under all the evidence, they were justified in finding that defendants assaulted plaintiff, as alleged, and that they were the aggressors, and that both defendants participated in the assault.

2.  We take it that the more important question in the case relied upon by appellants is as to whether, considering the assault and the circumstances thereof, the verdict was so excessive and so shocking as to show passion and prejudice on the part of the jury, and whether the verdict as reduced is excessive.  Indeed, we think this is the only question relied upon.  Counsel for appellant say in argument:

1. NEW TRIAL: excessive verdicts: manifest excessiveness required.

"While the errors relied upon for reversal appear under several heads, there is in reality but one question in this case, and that is this:  The evidence in this case does not support any such amount as that given by the jury, or even that

finally awarded by the court, and the amount so awarded is so out of proportion to the injuries received by plaintiff, as shown by the evidence, that it is clearly the result of passion or prejudice, and not the result of honest and intelligent deliberation and consideration on the part of the jury; and it should, therefore, have been set aside, and a new trial granted.''

It must be conceded that the verdict was large. Though it may be true, as contended by appellants, that plaintiff was not permanently injured, still the jury may well have found that the assault was an aggravated one. We say this without repeating the circumstances before set out, and without stating the elements of damage for which recovery may be had. The elements are well recognized in the law. It may be thought that, because the assault was an aggravated one, it may have had an influence upon the jury. Nevertheless, plaintiff is entitled to adequate compensation, the jury having found that defendants were in the wrong. We have said many times that the assessment of damages, both actual and exemplary, is peculiarly within the discretion of the jury. It is true, of course, as said in some of the cases, that this discretion is not unlimited. The test is, not what amount the court would have allowed, but whether the verdict is so large or small, as the case may be, as to shock the conscience. In *Hall v. Chicago, B. & Q. R. Co.,* 145 Iowa 291, cited in *Ideal C. S. R. Works v. City of Des Moines,* 167 Iowa 517, 522, we said:

''The mere fact that the amount assessed is more or less than the court would have been disposed to allow, were the case submitted without a jury, is not controlling, and will not justify the setting aside of the verdict. To call for such action, the amount allowed must be so great and excessive, or so small and inadequate, that the just and intelligent mind is forced to the conclusion that the jury has failed to comprehend the case as submitted, or has been influenced to its verdict by passion or prejudice. * * * It cannot be said that the sum actually awarded is so out of proportion to the injury suffered as to shock the conscience and point inevitably to the conclusion that the jury were misled by ignorance, passion, or prejudice. This is especially true in view of the fact that the learned trial court,

which saw the plaintiff and the witnesses produced on the trial, and heard their testimony, refused to set aside the verdict. Had it sustained the motion, and ordered a new trial because of the inadequacy of the verdict, the case would wear a different aspect.''

So here, had the trial court granted a new trial, on the ground that the verdict was excessive, we would have a different proposition. Appellant cites *Eastman v. Miller*, 113 Iowa 404, as holding that a verdict is excessive and the result of passion and prejudice when it is so excessive as to strike a reasonable mind at once by the disproportion between the amount and the extent of the injuries. In 5 Corpus Juris 709, Section 171, we find this doctrine:

''Courts will not disturb a verdict, in an action for assault and battery, unless it is manifest that the jury were swayed by passion or prejudice, were partial or corrupt, or were misled as to the measure of damages. It is not enough that, in the opinion of the court, the damages are too high, or that a less amount would have satisfied the injury. It must appear at first blush that the damages are glaringly excessive. And it has been held that courts of review should be more reluctant in interfering with verdicts on the ground that the same are excessive, than trial courts.''

Many cases are cited to sustain the text. We are of opinion that, compared with verdicts in other cases of assault and battery where the facts were somewhat similar, which are referred to later, the verdict in this case was not of a size such as to be shocking to the conscience, nor is it so excessive as to strike a reasonable mind at once to be disproportionate between the amount and the extent of plaintiff's injuries. We have held that the mere fact that the verdict is too large, and is reduced by the trial court, does not, of itself, necessarily require the granting of a new trial, on the ground that it is the result of passion and prejudice. *Doran v. Cedar Rapids & M. C. R. Co.,* 117 Iowa 442; *Schmidt v. Mehan,* 167 Iowa 236, 239. In the *Doran* case, the verdict was reduced by the trial court from $8,300 to $4,500, and the ruling was affirmed. The reduction in that case was much larger than in the instant case. See also citations from 4 Corpus Juris, infra.

3. Cases are cited by, appellants wherein verdicts were held to be excessive. Appellee cites cases wherein verdicts were held not to be excessive. Some of these are of greater size than the verdict in the instant case. Much depends upon the circumstances of each case. And it may be said, too, that the size of the verdict depends somewhat upon the make-up of the jury in individual cases; also, upon the view of the trial court and the appellate court. Some appellate courts are more reluctant to interfere with the discretion of the lower court and the trial jury than others. The rule of our cases is that, even though the verdict is large, we will not interfere, unless the verdict appears clearly to be the result of passion and prejudice. *Reutkemeier v. Nolte,* 179 Iowa 342, 352, and cases; *Albrook v. Western Union Tel. Co.,* 169 Iowa 412, 429. See also 4 Corpus Juris 869, Section 2846, and page 871, Section 2847, and page 835, Section 2818, where many cases are cited to the proposition that the action of the trial court in granting or denying a motion to set aside a verdict on the ground that the damages are excessive, is within the discretion of the trial court, and not subject to review, except where it is made to appear clearly that the discretion has been abused; and that, ordinarily, the amount of damages is so much a matter within the exclusive province of the jury that it will not be disturbed by the reviewing court, and especially so where the verdict has been approved by the trial court; also, that the authority vested in courts to disturb the verdict of the jury on the ground of excessive damages is one which should be exercised with great caution and discretion, and ordinarily the court will refuse to set aside a judgment on the ground that the award is excessive. In *Union Mill Co. v. Prenzler,* 100 Iowa 540, 548, 549, we said that, in attachment cases, we would not interfere with the allowance of exemplary damages, except in extreme cases. See, also, *Saunders v. Mullen,* 66 Iowa 728, where we said:

"A court, and especially an appellate tribunal, should not interfere in such cases, unless the conclusion is irresistible that the amount is so great as to evince prejudice on the part of the jury."

See, also, note to *International Harv. Co. v. Iowa Hdw. Co.,* 29 L. R. A. (N. S.) 282.

In the *Reutkemeier* case, supra, the recovery was for $6,500 actual and exemplary damages for an assault and the debauchery of plaintiff's daughter. Though we said the recovery was large, we did not interfere.

Appellant cites several cases to the point that, when the award indicates passion and prejudice on the part of the jury, the only adequate remedy is to set aside the verdict and award a new trial, rather than order a remittitur; and that, where it so appears, a remittitur does not amount to a full discharge of the duty of the court. Conceding this to be the rule, the question is whether this is such a case. As throwing light upon the question of what may be regarded by the court as a proper amount,—though not controlling,—appellant cites *Jolly v. Doolittle,* 169 Iowa 658; *Cain v. Osler,* 168 Iowa 59; *Schmidt v. Mehan,* 167 Iowa 236; *Zimmerman v. Northern Pac. R. Co.,* 157 Wis. 514 (147 N. W. 1039); *St. Peter v. Iowa Tel. Co.,* 151 Iowa 294; *Rees v. Rasmussen,* 5 Neb. (Unoff.) 367 (98 N. W. 830); *Kehl v. Burgener,* 157 Ill. App. 468; *Jansen v. Minneapolis & St. L. R. Co.,* 112 Minn. 496; *Fleming v. Loughren,* 139 Iowa 517; note to *Padrick v. Great Northern R. Co.,* 58 L. R. A. (N. S.) 1, 30 (1915 F 1, 30). In the *Jolly* case, the actual damages were trifling, and the court held that, if the $1,500 awarded was for that alone, it would be excessive. The claim there was self-defense and extreme provocation. The *Cain* case was an action for slander, and the award was for $2,500, which was largely exemplary. The charge was that a steer had been stolen, and the evidence showed that the defendant honestly believed that the steer belonged to him. In the *Schmidt* case, plaintiff was not seriously hurt. The trial court held that the award was excessive. There was no pronouncement by this court as to that. In the *St. Peter* case, the verdict was $2,000 actual damages; no exemplary damages were claimed; the external injuries were superficial; and plaintiff's injuries were not great. In the *Fleming* case, it was held only that the award was not excessive. We shall not take the time to review the other cases, but consider the above as illustrative. As said, the holdings vary. On the other hand, appellee cites the *Reutkemeier* case, supra, which has been referred to; also *Smith v. Smith,* 185 Mich. 172 (151

2. TRIAL: excessive verdict: option to remit.

N. W. 647), where a woman 30 years of age, the mother of two children, was assaulted by her mother-in-law, a woman of 70. Some slight, superficial injuries were inflicted. The evidence showed that the shock of the assault caused neurasthenia. The jury awarded $10,500. This was held to be excessive by $5,000, and the balance, $5,500, was allowed to stand. Appellee also cites *Hageman v. Vanderdoes,* 15 Ariz. 312 (138 Pac. 1053); *Barr v. Post,* 56 Neb. 698 (77 N. W. 123, 127). The award in the *Hageman* case was $6,500, and appellee contends that the facts therein are similar to those in the case at bar. It should be said, however, that the wealth of defendant was an issue in that case. In the *Barr* case, the actual damage awarded was $2,000. The assault was on a pregnant woman. In 5 Corpus Juris 710, Note c, a large number of cases are referred to wherein it was held that verdicts from $150 to $7,000 were not excessive. The injuries inflicted in such cases varied from a blackened eye by the fist to serious and permanent injuries. In *Winston v. Terrace,* 78 Wash. 146 (138 Pac. 673), $2,000 was held not excessive, where a woman of 60 was threatened with a revolver and ordered out of her home, and it was necessary to send her away for two months to recover her normal self. $2,500 was held not excessive in *Clark v. Aldenhoven,* 26 Colo. App. 501 (143 Pac. 267), for a violent assault on a woman. The same amount was allowed in *Rand v. Butte Elec. R. Co.,* 40 Mont. 398 (107 Pac. 87). In *Fitch v. Huff,* 218 Fed. 17 (134 C. C. A. 31), $3,000 was held not excessive for an assault on a woman. It would serve no useful purpose to refer to other cases. After a thorough examination of them, we reach the conclusion that, although the amount of $3,500 actual damages, awarded by the jury, is large, and, as held by the trial court, excessive as returned, it is not so glaringly excessive as to justify our interference, on the ground that the jury was impelled by passion and prejudice. Neither would we be justified in interfering with the amount of actual damages as finally fixed.

4. Having held that the verdict of $2,000 actual damages is not excessive, the next question is whether that of $1,500 exemplary damages is so. There is, of course, no definite rule, and the award of exemplary damages is also within the discretion of the jury. In a sense, they are, to some extent, compen-

satory. Exemplary damages, according to the ordinary accept-
ance of the term, are damages imposed by way of punishment;
but they are otherwise described as "added," "punitive," "im-
aginary," and so on. However, the idea of punishment does
not, according to all authorities, enter into the definition of
exemplary damages, but the term is employed to mean an in-
creased award, in view of supposed aggravation of the injury
to the feelings of plaintiff by the wanton or reckless act of de-
fendant. It has also been employed as descriptive of elements
of recovery not susceptible to pecuniary measurement, and of a
sum for plaintiff's expenses in litigation, awarded in addition
to his actual damages. 17 Corpus Juris 712, Section 18, and
page 968, Section 268. In the last citation, at page 970, it is
said that, in some jurisdictions, a greater liberality is exhibited
toward the measure of damages for so-called mental injuries
resulting from any wantonness and outrage accompanying the
commission of the tort. It often happens that the exemplary
damages are much larger than the actual damages. In *Soesbe
v. Lines,* 180 Iowa 943, 948, an attachment case, an allowance
of exemplary damages more than 25 times the amount of the
actual damages was not permitted to stand. In *Union Mill Co.
v. Prenzler,* 100 Iowa 540, 545, the actual damages allowed were
$770, and exemplary damages, $5,000. That was an action on an
attachment bond. There was no personal injury in that case.
The debtor was sick, and the creditor, the plaintiff, by threats
of legal process and intimidation, tried to induce the debtor's
wife and daughter to turn over the property. Failing in this,
they wrongfully sued out the attachment. It would seem that
the mental feelings were not more outraged in that case than
those of plaintiff in the instant case. We think the allowance
of exemplary damages is not such as to justify interference by
this court.

On the whole case, after a careful examination of the record
and of the authorities, we reach the conclusion that there is no
prejudicial error. The judgment is—*Affirmed.*

WEAVER, C. J., and EVANS, J., concur.

SALINGER, J.—(concurring). The appellant is entitled to
trial by jury. If the verdict shows by its grossly excessive char-

acter that the jury has not given him a fair trial, a reduction by the judge is irrelevant. A fair verdict by the judge does not cure that the body which is the one to return verdict permitted passion and prejudice to control its action. The amount to be awarded was submitted to a jury, and not to the judge. The question to be settled is whether the verdict of the *jury* is the result of a fair hearing. If yea, no reduction by the judge is demanded. If nay, he cannot take the place of the jury, and determine in its stead what the award ought to be. I concur in the result on the sole ground that the verdict of the jury is not so manifestly and strikingly excessive, where an assault upon a woman is the cause of action, as that this court is warranted by the size of the allowance to hold that appellant has not had a fair trial by jury. If the amount of the verdict were so grossly excessive as to indicate passion and prejudice, granting new trial, and not reduction, would be the cure.