ANTOINE HORST, Appellee, v. HENRY HANDKE, Appellant.

**TRIAL: Instructions—Presentation of Hostile Theories.** Instructions reviewed, as to the relative rights of contending parties to the possession of premises, and to the right to use force, growing out of an attempt to forcibly remove, and held to adequately present the hostile theories of the parties.

**TRIAL: Instructions—Nonapplicability to Evidence.** Instructions which permit a recovery, up to a *stated* amount, of the reasonable value of medical services, *past, present, and future,* when there is no sufficient evidence of any necessity for future services or of the value thereof, are nonprejudicial, when the jury was amply warranted in allowing the full *stated* amount for *past* and *present* services.

**NEW TRIAL: Verdict—Excessiveness.** Verdict for $2,900 actual and $1,600 exemplary damages for wrongful assault, reduced by the court to $1,200, held nonexcessive, under the record.

*Appeal from Pottawattamie District Court.*—O. D. WHEELER, Judge.

JANUARY 11, 1921.

ACTION by plaintiff to recover damages for an alleged assault, with a counterclaim by defendant for damages for malicious prosecution. Trial to a jury. Verdict for plaintiff for $4,500, $2,900 of which was actual damages, and $1,600 was exemplary damages. Nothing was allowed on defendant's counterclaim. The above matters are shown by the answers to five special interrogatories. The jury also found specially that the criminal prosecution was not without probable cause, and that plaintiff did not commence it maliciously. On motion for new trial, the trial court held that the verdict was excessive, and reduced the same to $1,200, at the election of plaintiff, which she elected to take, and judgment was entered for that amount. The defendant appeals.—*Affirmed.*

*Kimball, Peterson & Smith* and *John P. Organ,* for appellant.

*Hugh P. Finerty* and *H. L. Robertson,* for appellee.

PRESTON, J.—The issues, stated as briefly as may be, are, as alleged by plaintiff, that, on October 5, 1916, plaintiff and her husband and family were residing on lands owned by the

1. TRIAL: instructions: presentation of hostile theories.

defendant, which they had leased from defendant's son, Adolph, for the year 1916; that the premises so occupied and leased to them comprised a house, summer kitchen, part of the barn, and about an acre of ground; that, while she and her family were in the actual possession of said buildings and premises, and while she was in said summer kitchen, defendant wrongfully, unlawfully, wantonly, and maliciously made an assault upon her, and with great force and violence threw her out of said summer kitchen, and thereby caused her to fall out of the door on some boards and other objects, such fall covering a distance of two feet from the door, causing plaintiff severe and permanent shock and injury to her nervous system, two broken ribs, miscarriage, severe injuries to the muscles of her arms, side, and back, and permanent injury to her heart, spine, and other internal organs; that said injuries are permanent, and that she has suffered great physical and mental pain, worry, and humiliation, and will so suffer in

the future; that said assault was made for the purpose of harassing and oppressing her, for the purpose of causing her to vacate said premises.

Defendant denies generally, but admits that, at the date stated, plaintiff resided upon his farm, and used and occupied a portion of the real property described in the petition. He denies that plaintiff occupied said farm as a tenant; denies there was any summer kitchen on the premises; denies that plaintiff and her family were in the actual possession of any summer kitchen. He says he rented to plaintiff's husband the house and the use of a part of the barn, and one acre of ground upon said premises, for $5.00 a month, subject to the right of defendant and his sons to use the barn yard and other buildings; that in the yard was a one-story granary, partitioned off into grain bins, at all times in the actual possession of defendant, in which he had stored tools, harness, etc.; and that said building was never rented to plaintiff's husband or to anyone, except that defendant's sons, farming said land, used the same; that, on the date in question, he was in said granary, removing some articles and arranging to use said building for himself and his son, who was farming said lands, when plaintiff made a vicious assault upon him with a hatchet, and endeavored to drive defendant from his premises, and made an assault with intent to inflict great bodily injury; that defendant, without malice, and without using more force than was necessary, grasped the plaintiff's hand which held the hatchet, and took the hatchet from her; that he did not injure plaintiff, and that, if she was injured, it was by other means and other circumstances than by any act on the part of defendant. By way of counterclaim against the plaintiff, defendant says that, on the date in question, plaintiff maliciously, through her husband, acting for her and on her behalf, filed an information against defendant, charging him with the crime of assault with intent to do great bodily injury, under which he was arrested; that such proceedings were without probable cause; that there was never any trial under said information, but that the same was dismissed for want of prosecution; that defendant has been damaged in the sum of $1,000, for which he asks judgment. The reply denies all such allegations.

The jury was told, in substance, that, there being a dispute between the parties as to the transaction in question, it was for the jury to determine, from all the evidence, what in fact did occur between the parties at the time in question, and the circumstances under which it occurred. We take it that the vital point in the case is as to the character of the building which plaintiff calls a summer kitchen, and whether it was a part of the dwelling, or whether, as defendant claims, it was a mere granary, and, under all the circumstances of the case, what the rights of the parties were, in reference thereto. The issues, direct and collateral, were many. There were 49 instructions to the jury, which instructions seem to have been carefully drawn. The errors assigned relate, for the most part, to the instructions. We do not understand appellant to complain of the instructions in reference to the counterclaim. Such instructions are not even set out in the abstract. Some of these, if not all, are set up in appellee's additional abstract. Briefly, the complaint is that the court ignored issues tendered by defendant, to the effect that he was in possession of the granary at the time of the assault, and that he was rightfully in possession thereof; that other instructions assume facts of which there is no evidence, or where the evidence is in conflict; that the court erred in failing to instruct that defendant was in the actual use and possession of the building in question, during all the time the dwelling was leased to plaintiff's husband; that others of the instructions were not applicable to the facts, and that they do not clearly state the law; that the court erred in not reducing the verdict to nominal damages, the same being excessive, and the result of passion and prejudice; and that the court erred in refusing to give an instruction asked by the defendant.

Without going into the evidence bearing upon all questions in the case, it seems necessary to set out a part of it at least, as applicable to the more important points.

Plaintiff is a Polish woman, wife of Fred Horst, to whom she had been married 10 or 11 years; and there were three young children. She, with her husband, children, and her father and mother, were living on the premises in question on October 5th, the day of the trouble. The evidence introduced on behalf of plaintiff tends to show that plaintiff and her husband rented

the place from Adolph Handke, and that they were to have the summer kitchen referred to in this case all of the time, and the garden tract, which was a part of the place.   Defendant had orally rented 40 acres, upon which were situated the buildings and garden before mentioned, to his sons, Adolph and Fritz, and they were giving to defendant one half the crop grown thereon during said year.   About October 3, 1916, defendant's son Adolph served a notice to quit, which is addressed to plaintiff's husband, notifying him to quit and surrender to said Adolph the ''premises now occupied by you as a dwelling, for yourself and family,'' which dwelling is situated on the 40 acres which is described, as he, Adolph, is the lessee of the entire premises; and that, upon failure to quit and surrender to him the said premises within 30 days, legal steps would be taken to obtain possession, etc.   Plaintiff and her husband first rented this place in 1914.   Gus Handke farmed the place that year.   The contract that year was between defendant and plaintiff's husband, and plaintiff and her husband were to pay defendant $5.00 a month, and it was to be paid by boarding Gus, at so much a meal.   When plaintiff and her husband moved to this place, in 1914, they moved one of their stoves into this building, which plaintiff calls the summer kitchen, and set the stove up in it; and plaintiff and her husband lived in the main house, and used the summer kitchen to cook in, all the time they lived there, during the summer time.   Plaintiff says, ''I cooked and ate in the summer kitchen in the summer time.''   There were two rooms in this summer kitchen.   It was divided into two parts.

''The door in the kitchen of the main house was on the south side, and this summer kitchen was about 15 feet northwest of the house.   The door in the summer kitchen was also on the south side of it, so that you came out of the kitchen door in the house and would go north along the west side of the house into the door leading into the summer kitchen.   These two rooms in the summer kitchen were boarded up with lath.   One side of this granary is a summer kitchen. 'They have got a chimney in there.   On the other side was not any chimney.'   The bin or granary part is closed from the kitchen part, and you have to go around to the west door of the granary, to get into the grain bins.   The part of this granary that is the summer kitchen is on

the east side, and toward the road which runs north and south
on the east side of these premises. At the time of the trouble
between plaintiff and defendant, the plaintiff had a cookstove
and an ironing board and a washing table and a wash board and
some other little garden stuff and things like that in the east
part of this building, called by the defendant a granary, and by
the plaintiff, a summer kitchen. Adolph Handke had an old
set of harness in this summer kitchen part, but Henry Handke,
the defendant, had nothing whatever in there. Plaintiff's father
had put this old set of harness in there himself. Defendant had
nothing in that part of this building used as a summer kitchen,
at the time of the trouble in question.''

They baked bread in the summer kitchen. On a cold day,
they baked it in the other kitchen. Just before the service of the
notice to quit, Fritz, one of the defendant's sons, had told plain-
tiff that she must get her stuff out of the summer kitchen within
24 hours. Adolph never asked her for it, but he gave her the 30-
day notice before set out. On October 4th, in the morning,
Fritz and Adolph went into this summer kitchen where plaintiff
was working, and told her that, if she did not get every piece
out of there, they would kick it out. Plaintiff asked them to wait
and see her husband, who was working at another place. On
said date, plaintiff put Adolph and Fritz out of the summer
kitchen, and shut the door. She told them at the time that they
could not come in there. She says it made her mad when the
Handke boys came there that morning and took her beets and
potatoes out of the building. She told them they could not come
into the summer kitchen before November. The next day, Oc-
tober 5th, defendant came to plaintiff's house and demanded
that she remove her things from the summer kitchen. She told
him she was not going to give him possession of it, as she says:

"I said to him, I was not going to let him in the summer
kitchen; that I had rented it. He said I didn't rent it at all.
I said to him, 'Before they take this out, I call my husband.'
He said he had got nothing to do with him. He said, 'I go out
and take every piece out.' I said for you not to do that, 'you
call him.' Then he started to go out to the summer kitchen, and
I went also. He went first, and I went out after him. I got in
the summer kitchen ahead of him. I went past him in the door.

The door was open. The hatchet was outside by the window, in the winter kitchen. There was a little chair there by the window and the hatchet was on it, and I took it into the summer kitchen, so I would have something in my hands.''

She says that she was not angry; that she had her hands down by her side; that she thought to scare defendant; that she told defendant to call her husband, and said to defendant, ''Never touch it before I call my husband;'' that she called for her mother to help her; that her hatchet fell on the ground, and then defendant's boys came up and came in the door, as she fell down; that defendant was inside the kitchen when he caught her by the hands, by the stove; that there was a good hot fire in the stove; that she was cooking something there for the folks. The evidence shows the situation and conditions outside, how she claims she was thrown out of the kitchen and down the step, how she fell, her injuries, and the effects thereof. Medical witnesses say that she was severely injured; that it caused a miscarriage: and they describe in detail matters of this kind. In all, five or six witnesses were examined for plaintiff, and about the same number for defendant, including himself and some of his sons. Other witnesses testify further in relation to the building and other matters. One says there was a tin pipe chimney in the summer kitchen; that it was painted gray, not red, like the barn; that defendant said he was going to set plaintiff's things out of the summer kitchen, referring to the building as a summer kitchen; that defendant helped to carry the things out of it; that, after defendant got plaintiff out of it, his boys did remove all of her things out of the building. The partition between the two rooms in this granary or summer kitchen is boarded up nearly to the ceiling. The gable of the granary was all closed. Defendant knew that plaintiff had some things in this building.

Defendant testifies about renting the granary to plaintiff as follows:

''She asked me if she can rent the granary. Q. Did she ask permission to put any stuff in the granary at any time? A. In the first place, she put it in without asking. What she said afterwards about putting the stuff in the granary, she said to my boys.''

In July, before this trouble, plaintiff refused to board de-

fendant's boys. There was some controversy between plaintiff and defendant and his sons about this. Defendant had heard about the plaintiff's making objections to his use of his granary, about a week before October 5th. Defendant testifies:

"They told Adolph that they would not move,—they did not have any written notice. Then I told Adolph to go to Neola and get them a writing, and this written notice was prepared."

Defendant knew about the plaintiff's refusing to let his sons have this summer kitchen the day before the trouble.

Defendant further testifies:

"My son went to Neola, and had this notice to quit prepared, and brought it back to me, and showed it to me before it was served on Horsts. He said: 'I have got the notice here,' and read it off, and then he put it in his pocket and took it along. That was all right with me. That was the date it bears, October 3, and the next day my sons had some trouble with Mrs. Horst about this summer kitchen. I knew that meant that he [Adolph] was the landlord of the Horsts on this place, and I knew that this notice meant that Adolph wanted the Horsts to quit, and leave the place in 30 days. It was a 30 days' notice to quit."

Defendant knew that plaintiff had refused to let his sons have the building the day before the trouble. Defendant testifies:

"The next day after I had this notice, Exhibit 1, served on the Horsts, my sons took some goods over to the Horst place in a wagon, to put in the summer kitchen or granary. I told them they could set their goods in the granary. I knew when they left my place that they were going to put their goods in this granary. Q. And that was your intention and purpose, was it not? A. Yes, sir. I told them they could put them in the granary there,—yes, sir. * * * My son Adolph went down to Handke's place with me in the buggy. It had been arranged between my boys and me that I was to go down and see Mrs. Horst the next day about this matter. The boys and I had talked that matter over. Fritz went down to the Horst place early in the morning, and I told him that Adolph and I would be down there to the Horst place as soon as we got our chores done. Yes, I stopped and told Spencer to come along with me. I had known him for several years. I had known him and been

friends with him for over 20 years. I said to him, 'Come and go down to Horst's with me.' He says, 'I will go if it doesn't take so very long,' and he says, 'What do you want me to do?' He says, 'I will go along; what do you want me there for?' I says: 'They have put their stuff in the granary; they don't want to take it out; so I want you to go along and see that every-thing—that nobody gets hurt, or that they can't put any blame against me.' Told him I was going down to put her things out of the granary, and that he better go along, in case there might be some trouble. I knew she had run the boys out of the kitchen the day before, with a stick. I had it in my mind when I went down there that there might be some trouble with the woman.''

Defendant had told his sons that he wanted them to help him take her things out, if necessary. He testifies that plain-tiff got into the kitchen ahead of him, and admits that he took hold of plaintiff's wrists and held her hands until she got out of the granary; that she was trying to get loose from him all the time; that he was pulling her back toward the door, intend-ing to get her out of the granary; that he did put her out; that he was mad and excited; that he and his sons took everything of hers out of the granary and put it in the yard, and then went away. Defendant further testifies:

''I knew my son Adolph Handke signed the notice to quit as landlord, and I knew that meant that he was the landlord of the Horsts on this place; and I knew that this notice meant that Adolph wanted Horsts to quit and leave the place in 30 days.''

Defendant's son Fred says:

''My father, defendant, helped us take Mrs. Horst's things out of this granary on October 5, 1916. Whatever I did in help-ing to take the things out of that granary that day, I did under the direction of my father.''

Though there is a sharp conflict in the testimony at some points, some of the foregoing matters are not disputed. Defend-ant's evidence tends to show that, in 1915, plaintiff asked de-fendant and his son Adolph to rent her an acre of ground; that Adolph and Gus lived in the room upstairs, during 1915 and 1916, and got their meals at Horsts', while working the farm; that the board of the sons paid the rent on the premises in con-troversy to July, 1916; that no rent was paid by the Horsts after

they quit furnishing meals to the boys—from July to October. The defendant claims that the first time he heard the building in question called a summer kitchen was at the trial; that the granary was used for a grain and tool house by the defendant. He says that there were bins in one corner, and an open space in front of the bins; that the door of the granary is on the south side, and about 15 feet from the corner of the kitchen of the main house; that defendant used the granary all the time the Horsts were on the place; that they put their grain in it, and had no other place for grain, also for tools, harness, etc. Defendant testifies that there was nothing said about the granary or the use of it, between him and plaintiff; that Mrs. Horst was not present, at the time the place was rented to her husband, in 1914; that defendant never had any talk with Mrs. Horst about renting the buildings in controversy; that defendant and his boys had been in and out of the granary all the time until the trouble on the 5th; that the Horsts cooked in the house, but that they had set up a cookstove in the granary. Defendant says that the first time he ever noticed that a pipe had been put up on the stove was on the morning of the trouble; that Mrs. Horst put the stove in the granary without asking; that they cooked beets and feed for the chickens in the granary, but did not cook meals; that, if plaintiff did cook meals there for the family, in the summer, it was not when any of the Handkes were about. On October 4th, the Handke boys took a bed, a cookstove, and a heating stove over to the granary. They left the cookstove outside, and put the bed in one corner. They asked Mrs. Horst to take her things out, as they wanted to use the granary to put their stuff in, until Horsts moved away. Some of defendant's witnesses claim that plaintiff had told Adolph that, any time they wanted to use the granary, she would put her stuff out; that she just put it in there to store it. Plaintiff got a club and ordered the boys out of the building, the day before the trouble of the 5th. Appellant says in argument that the dispute as to what occurred at the granary door, after defendant arrived on the 5th, is mainly as to the extent of plaintiff's injury. When defendant went to the house, he asked her to remove her stuff from the granary, because he wanted to use it, and told her that, if she would not take it out, he would.

Plaintiff replied that Adolph had rented the place to her. Defendant then said that it was his place, not Adolph's. He claims that plaintiff ordered him out of the building, and, as she swung the hatchet, he grabbed it; that she was close to him when she swung the hatchet. Defendant contends that plaintiff's injuries were not as serious as she claims. It is claimed by defendant that, on the morning of the 5th, plaintiff had an accident, when she was taking her children to school, or returning. An employee of the railroad company testifies that he saw plaintiff, the morning he heard of the trouble; that he heard a racket; that he looked up, and saw Mrs. Horst outside of the buggy, getting up from off the ground; that Mrs. Horst held her hand to her side; that this was at 9 or 10 o'clock in the forenoon. A blacksmith testifies that, on the 5th, the plaintiff's horse and buggy was at his shop, with a broken thill; that the shaft needed to be mended; that they got a secondhand shaft from him with which to fix the old one; that he doesn't remember what was the matter with the shaft; that it needed mending; that he took that one out, and put the other in place of it; that he charged 25 cents. It does not appear in his testimony what person brought the rig to witness. Plaintiff denies that she had any accident, but it seems to be undisputed that the buggy was mended. Defendant testifies as to his arrest, and so on.

1. Several assignments are made, covering the thought that the court ignored the issue tendered by defendant that he was in possession of the granary at the time of the assault, and that he was rightfully in possession thereof, and that the court erred in failing to instruct that defendant was in the actual use and possession of said granary all of the time, and in restricting, by instructions given, the right of defendant in his use of his own buildings, and in ignoring his right of the full possession of the same, and in holding that, under certain circumstances, he was a trespasser. We think the court did not ignore defendant's claims. The matters are quite fully covered by some seven or eight instructions. Under the evidence, the jury could have found that defendant had rented the premises for the year 1916, covering the transaction in question, to his sons, and that they had rented the dwelling and other outbuildings to the plaintiff. The mere fact that defendant was the owner of the fee, under

such circumstances, did not, of itself, give him the possession of the part of the granary or summer kitchen in dispute, or the right of possession. If defendant or his sons wished to dispossess her, an action of forcible entry and detainer, or other appropriate legal action, was open to them. But, as said, the jury could have found that plaintiff was in possession, and rightfully in possession, at least of that part of the building which she says she was using as a summer kitchen, and could have found that it was a part of her home, or the dwelling. Defendant's sons, as lessees of the defendant of the entire property, had a right to assign or sublet the same, or any part thereof, without the consent of the defendant, since there were no restrictions. 24 Cyc. 962; 16 Ruling Case Law, 825, 828. Defendant could, in the lease, have restricted his sons, as lessees, from assigning or subletting, but did not do so. 16 Ruling Case Law 831.

In *Denecke v. Miller*, 142 Iowa 486, it was held that, where the property was not to be sublet, on penalty of forfeiture of the lease, the subletting of a part of the building does not amount, in itself, to such a breach of the condition as to justify a forfeiture. Possibly, under some circumstances, and for some purposes, the rule might be different as to a mere cropper; but that question is not in this case, since the rights of the parties, as between defendant and his sons, for the crop rent, are not involved. The jury could have found that the defendant, prior to the alleged assault, knew of all these matters, and knew of plaintiff's claim; and, though there is a dispute as to some of these matters, the jury could have found that the plaintiff was herself personally in that part of the building which she claims was a part of the dwelling, and that defendant went in for the sole purpose of dispossessing her, after his two sons had failed, the day before. The notice to quit had been served only a day or two before this transaction, and, under the notice, she would have 30 days to vacate. Though this notice is signed by the son, according to defendant's own evidence, it was prepared and served in defendant's behalf. The jury was justified in finding, from the evidence, that defendant went to the premises on the 5th for the sole purpose of dispossessing her of the building in question; that he was the aggressor; and that he went there ex-

pecting trouble. The instructions are too lengthy to set out in full, but we think they covered both sides of the contentions of the parties, and left the disputed fact questions for the determination of the jury. Though plaintiff claims to have rented what she calls the summer kitchen, she does not, as we understand it, claim to have rented the entire building, which defendant calls a granary. At any rate, she does not dispute the right of defendant to use and enter the other part of the building, or room in the granary, to store or remove his harness, tools, etc. The controversy is in regard to the part or room which she calls the summer kitchen, and which, her evidence tends to show, was so used exclusively by her. Defendant concedes that he went there for the very purpose of removing her things, and dispossessing her entirely. There was no joint possession—at least the jury could have so found—of the kitchen part. We do not understand appellant to make any claim that there was any joint possession. His claim is that plaintiff had no right of possession, and was not in possession; but that he alone had the right of possession, and that he was in sole possession. The conflict in the evidence at this point made it a question for the jury. We shall refer to the instructions on these several matters as briefly as may be, without giving the full text.

The jury was told that, under the evidence, the building in question had been used by defendant as a granary and storehouse, and that he had certain personal property therein; that, this being so, he had the right to enter the said building for any purpose consistent with his use of said building for such purpose, but that he did not have the right to enter it for the sole purpose of removing therefrom, forcibly and against the protest of plaintiff, the personal property which she and her family had in the building, and were then using; that, when defendant sought to enter the said building for that purpose, and that alone, he thereby became a trespasser. In Instruction 8, the court said that it was conceded that, when defendant entered the building, or was in the act of doing so, plaintiff seized a hatchet, for the purpose of preventing him from removing her chattels; that the manner in which she used the weapon, and what she in fact did with it, were matters of dispute between the parties. The court then stated the claims of each, and said that it would be for

the jury to determine what plaintiff's conduct was in this respect. Another instruction said to the jury that one who is assailed in the dwelling house or habitation of the family has a legal right to use such means to defend himself or the dwelling against the intruder as are reasonably necessary to protect his person or the home, even to the use of a dangerous weapon; but that, in the defense of a building which is not a part of the dwelling or habitation, one cannot lawfully use a deadly weapon, merely for the purpose of expelling a trespasser; and that, under the evidence, the defendant was a trespasser in said building, inasmuch as he testifies that he went into it for the sole purpose of taking plaintiff's effects out. In other instructions, the court told the jury that it was material to determine from the evidence the character of the use which plaintiff had been, and was at that time, making of the particular building; that plaintiff claimed she was and had been using it for some period as a summer kitchen, while defendant claimed that it had not been so used, but had only been used by her for the purpose of storing certain articles, and that, if any cooking was done in the building, it was only in the nature of feed for the chickens or the cattle. By another instruction, the court said that, if plaintiff had shown, by the greater weight of the evidence, that she and her family had been, and were at the time in question, using said building as a summer kitchen, then the jury would be warranted in finding that it became a part of the dwelling, and that, in that case, plaintiff would have the right, and did have the right, to defend the same and the property therein and the removal of her property therefrom by all of the means reasonably necessary therefor, and so on. And in another: But if, on the other hand, the building was merely used by plaintiff and her family as a storehouse, and for the purpose of occasionally cooking feed for the animals, then it would not become a part of the dwelling, and plaintiff would have no right to defend the same against a trespasser by the use of a deadly weapon; and if, under such circumstances, she did use such a weapon, and attempt to strike the defendant therewith, then, under such circumstances, the defendant would be justified in using so much force only as was reasonably necessary to prevent injury to himself.

These instructions just referred to were elaborated upon in

later instructions, and the jury was told that, if they should find that plaintiff was using the building as a summer kitchen in the manner she claims, and that the defendant, under such circumstances, resisted or sought to resist, and in so doing injured her, substantially as claimed in the petition, he would be liable for the damage occasioned; but that if, on the other hand, the building was used as a storehouse by her, and for cooking feed, and if, when defendant sought to enter, plaintiff attempted to strike him with a deadly weapon, then, in that event, defendant had the right to use such force only as was reasonably necessary to prevent injury to himself from the weapon so used by her, and, if the jury should so find, plaintiff should not recover; and further that, if the jury should find that plaintiff was using the building as last stated, and not as a part of the dwelling, and if plaintiff did use a deadly weapon and attempt to strike defendant, and he used only such force as was necessary to prevent injury to himself; and that, if the defendant, under such circumstances, used more force than was reasonably necessary, etc., and, by reason of such excessive force, caused injury to plaintiff, then defendant would be liable for such injuries. And again: That, if plaintiff held the hatchet at her side, and made no attempt to use it upon defendant, as she claims, and if, under such circumstances, defendant seized her violently and ejected her from the building, and threw her down upon some board or boards and other obstacles, and thus injured her, then, under such circumstances, defendant would not be justified or warranted in seizing the plaintiff and ejecting her from the building, and, if he did so, under such circumstances, she would be entitled to recover. We have condensed the foregoing instructions materially, but have attempted to give the propositions embodied therein. It seems quite clear to us, from what we have said, that the court did not ignore the defendant's claim in regard to the possession and his right to possession, but that his theory of the case was fully and fairly presented, under the evidence in the case.

Appellant cites authority to the proposition that one has no right to use force to acquire possession when he has no real or fancied right, and when the person assaulted is in lawful possession. We understand appellant's contention as to this to be

that the plaintiff would have no right to use force to acquire
possession when she had no real or fancied right, and when the
defendant was in lawful possession. It seems to us that it is a
sufficient answer to this to say that appellant's theory was dis-
puted by plaintiff, and that the evidence was such as to warrant
a finding by the jury that defendant was not in the lawful pos-
session of the property, but that plaintiff was. And this is true
as to appellant's next proposition, which is that one whose pos-
session is wrongful has no right to use force to obtain a re-entry
against one having rightful possession, and that even a tenant
may not, by force, dislodge his landlord who enters during
tenant's absence. As we understand it, appellee does not dis-
pute appellant's cases on this, but they contend that they are
not applicable to the evidence. We think it is more a question
of fact than of law. Appellee cites *Emsley v. Bennett,* 37 Iowa
15, 16, *Kimball v. Shoemaker,* 82 Iowa 459, and *Currier v. Jones,*
121 Iowa 160, to the proposition that, in some cases, a mere
trespasser is entitled to recover. We assume that this is on the
theory that neither defendant nor his sons had rented the build-
ing in question to plaintiff. This feature seems to have been
covered by the instructions of the court. But, aside from this,
as said, we think the jury could have properly found from the
evidence that plaintiff did lease the building from the defend-
ant's sons. Appellant cites some Nebraska cases and a Michi-
gan case to the proposition that the use of a dangerous weapon
is not warranted in protecting or obtaining possession of prem-
ises. An examination of the cases shows that the facts are quite
different from the case now presented. The instructions of the
court have support in *State v. Cessna,* 170 Iowa 726 (Ann. Cas,
1917 D 298), and cases therein cited. See, also, *People v. Tom-
lins,* 213 N. Y. 240 (Ann. Cas. 1916 C 916).

In the instant case, it appears that there were four men
present, against the one woman. The mental attitude of defend-
ant, and his acts, are shown. That a dwelling includes the
house used, and outbuildings used as a part of the dwelling, see
10 Am. & Eng. Encyc. of Law (2d Ed.) 353.

Other criticisms of the instructions need not be particularly
noticed. Some specific objections are made to some of the in-

structions already referred to, and to others, but the important points, as we view it, have been already discussed. One or two of these specific objections will be noticed briefly, to show the general tendency of the criticisms. For instance, it is thought that the court erred in instructing the jury, in Paragraph 4, that the sons of defendant were seeking to remove some of the property in the building which belonged to plaintiff, or to her parents. This is but one clause in a somewhat lengthy instruction, wherein the court was stating to the jury the facts that were admitted, or about which there was no substantial conflict. The language just mentioned refers to the transaction on October 4th. The exact language of the instruction at this point is:

"That, on October 4, 1916, the two sons of defendant brought some belongings to the farm, which they sought to place in this building, and for that purpose, sought to remove some of the property then in said building, and belonging to plaintiff or her parents."

There is no dispute in the evidence as to this. Furthermore, this particular matter was more in the nature of a recital of the circumstances leading up to the transaction the next day, between plaintiff and the defendant, when the sons and another party were present. Other criticisms are that the court erroneously assumed facts not established by the evidence, but these, we think, are not justified, and they are, too, based to some extent upon defendant's assumption that he was in possession of the building, whereas, as to this last, it was a jury question, as we have before indicated.

2. Parts of the instructions on the measure of damages are criticized, particularly a part of Instruction No. 20, which is only one of two or three instructions on the subject. One item 2. TRIAL: instruc- which the jury was told she might recover, if tions: nonap- the jury should find she was entitled to recover, plicability to evidence. was in reference to medical treatment. As to this, the trial court instructed:

"2. The reasonable value of treatment by a physician, so far as the same was made reasonable and necessary by reason of any injury received from the defendant at said time; and if you find that said injuries are of a more or less permanent na-

ture, and that further treatment therefor is reasonably neces-
sary, then the reasonable value of any further treatment by a
physician so rendered necessary; the amount of her recovery
for treatment, however, both past and future, cannot exceed the
sum of $150, being the amount claimed therefor.''

The objection to this is that the jury was allowed to specu-
late as to the future medical attention, and that there is no evi-
dence to support it. Appellant's argument at this point is very
brief. It may be that the criticism is justified, in part at least.
Appellee has not pointed out, and we do not find in the record,
any evidence as to the value of future medical attention that
might be required. Though defendant contends that plaintiff's
injuries were exaggerated, the evidence on behalf of plaintiff
tends to show that she was severely injured; that she was a nerv-
ous wreck, and was still suffering at the time of the trial; and
other circumstances. The evidence was sufficient to warrant a
finding that plaintiff would suffer in the future, because of her
injury; so that, as to this feature of the instruction, in regard to
permanent injury, there can be no question. Under these cir-
cumstances, future medical attendance would, in all probability,
be required, to some extent. Appellee's answer to this point is
that another instruction was given on the same subject, to which
there was no exception; and they argue strenuously, citing nu-
merous cases, that appellant has not, in argument, complied with
the rules, so as to have this matter reviewed. There is force in
the last suggestion; but we shall not review the cases, or dis-
cuss the matter in detail, for the reason that, under the record,
there could be no prejudice to the defendant. The instruction
flatly tells the jury that there can be no recovery on this item
for more than $150 for both past and future attendance. Dr.
Seward, after describing the treatment he had given plaintiff,
says that his services were reasonably worth $150. This is not
disputed. There was evidence from which the jury could have al-
lowed, under the testimony, $150, and the court told them that
there could not be any recovery for more than that amount on
this item.

3. Error No. 16 is:

''That the court erred in not reducing the verdict to nomi-

nal damages, the same being excessive, and the result of passion and prejudice. Supported by motion for new trial."

3. NEW TRIAL: verdict: excessiveness.

No reference is given to the page of the abstract where the motion for new trial may be found, or where the part complained of therein may be found. There is no brief point on this subject. The argument is very brief, and, in substance, is: There is no evidence that warrants any such verdict as $1,200, for injuries in this case. The verdict is still manifestly excessive, and highly unjust to one who had the legal right to use his own premises. Right away after the injury, the plaintiff started her suit for permanent injuries, and the whole case shows that it was a deliberate attempt by the plaintiff to induce defendant to make some show of resistance, and then claim damages. The testimony of the plaintiff and her witnesses is so manifestly extreme as to make this apparent.

A part of this is based on the assumption that, under the circumstances of this case, defendant had the legal right to use his own premises. We have already discussed that feature of the matter. There was evidence to justify the recovery of substantial damages. The amount ordinarily is within the discretion of the jury. The verdict was large, but this does not, of itself, warrant a new trial. The trial court made what seems to us a liberal cut. Larger amounts have been allowed to stand; but plaintiff has accepted the reduction. As bearing on some of these matters, see *Brause v. Brause*, 190 Iowa 329, and cases therein cited.

4. Appellant complains of the refusal of the trial court to give an instruction requested by him. The assignment is that the court erred in refusing Instruction 2, on the issue as to the extent of plaintiff's injury. The effect of the offered instruction was to say that defendant would not be liable in any event for any suffering or injuries except those that were occasioned by his acts. The jury was so told in Instruction 19 and in other instructions.

Other points are argued; but the opinion is already too long, and, since they are not controlling, we shall not further notice them. There is no reversible error, and the judgment of the district court is—*Affirmed*.

EVANS, C. J., WEAVER and DE GRAFF, JJ., concur.