PAUL MEYER, Administrator, Appellee, v. POSTAL TELEGRAPH-CABLE COMPANY, Appellant.

**MASTER AND SERVANT:** Workmen's Compensation Act—Presumption as to Rejecting Master. The presumption of proximate negligence which the law places against a master who has rejected the terms and conditions of the Workmen's Compensation Act has the force and effect of substantive evidence. Evidence reviewed, and held insufficient to overcome said presumption.

**NEW TRIAL:** Verdict—Excessiveness—$3,960. Verdict for $3,960 for death of a laborer reviewed, and held nonexcessive.

*Appeal from Scott District Court.*—D. V. JACKSON, Judge.

JUNE 22, 1923.

ACTION at law, to recover damages to the estate of deceased on account of his death on May 8, 1920, while in the employ of the defendant company. Trial to a jury. Verdict and judg-

ment for plaintiff for $3,960, upon which judgment was entered. Defendant appeals.—*Affirmed.*

*Berezniak, Dittus & Coler* and *Kaufman & Willis,* for appellant.

*Carl Lambach,* for appellee.

PRESTON, C. J.—At the time in question, deceased was in the employ of defendant, working between the town of Barney and the town of Lorimor, some five miles distant, on the right of way of the Chicago Great Western Railway Company, engaged in the construction or repair of a telegraph line belonging to the defendant company. The crew had been working out of Lorimor. The accident occurred about a mile southwest of Barney. A part of the duty of deceased was to operate a gasoline-propelled car, with trailer attached, under the direction of one Johnson, his foreman, upon the railway tracks along which the construction crew was working. While so engaged, and in the course of his employment, deceased was struck by a train, and injured. He died about an hour thereafter. Prior to the transaction, defendant had rejected the provisions of the Compensation Act. Deceased was 43 years of age, with a life expectancy of 22 years. He was capable of earning from $5.00 to $8.00 per day at his trade as an electrician and wireman, although, at the time of his death, his wages were about $3.50 per day.

Defendant denied that it was guilty of any negligence proximately causing the death, and asserted that the injury was due to plaintiff's own carelessness, and that his negligence was willful, and with intent to cause the injury. We think there is no evidence of willfulness, and it is not argued. It is conceded by appellant in argument that the case turns on the question of whether defendant was negligent. We take it from the argument that the proposition is really this: whether defendant has so completely exonerated itself and has so met and so conclusively overcome the statutory presumption as to leave no question for the jury. The errors relied upon are that such is the fact, and the contention as to whether defendant's negli-

gence, if any, was the proximate cause of the injury. It is further contended that the damages awarded are excessive.

It appears from the evidence that the crossing where deceased was struck was a dangerous one, and known as "Graveyard Crossing." It was the only crossing between Barney and Lorimor. The crew used a hand car and a trailer to deliver material up and down the line and to haul the men back and forth. Deceased was the man who was operating the motor car, and he had been doing the driving for some two weeks. The train was a way freight, going southwest, although the track at this point ran more nearly east and west. Northeast from the crossing the railway curves to the right. On the inside of the curve from the crossing, south of the track, there is a bluff, and the railroad runs through a sort of shelf or cut on the outside of the hill, so that the view of the train coming around the curve is cut off. Shortly before the accident, the motor car was being driven toward Barney, with materials which were dropped off at the poles where needed. This was on their way back from Lorimor. They stopped at the crossing in question, and then took the car and went about 600 feet northeast toward Barney, and picked up some tackle blocks and threw them on the car. The foreman was on the way back to the motor car with the blocks, when he first heard the train around the curve. When Johnson, the foreman, got off the motor car to pick up the tackle blocks, he was about 30 feet away from the car, when he heard the train whistling, approaching from Barney. He says:

"I did not know how close the train was, and we started for the crossing, rather than take the car off there, because it is easier to roll it off at a crossing, where you have the planks. I told Loitz to get out of the way,—'we have got to get out of the way,—that fellow is down there now,'—and started him for the crossing. We were nearly to the crossing when the train came around the curve at a speed of about 18 to 20 miles an hour. It might have been faster. When we got to the crossing, I jumped off and run to a point away from the track. My idea was to get out some distance, to get the eye of the engineer. The engineer could not see me, on account of the curve being there; so I went down the road on the side the engineer was on. I did

not see him until he was right at the crossing. · When we got to the crossing, I jumped off, and told Bill [Loitz] to get off and get clear, and I would block them. I ran down the road probably 70 feet, to attract the engineer's attention, by waving my hat, giving the side motion. The train was then probably 200 feet away from the crossing.''

By measurement, it was 210 feet from the crossing to the point of the curve.

Another member of the crew, who was working on a pole near the crossing, says he heard the train whistle for the crossing; heard the motor car coming; got down from the pole as fast as he could, and went through the fence.

"The fence was torn down there where I went through. Threw off my belt, and got over to the crossing at the same time the car pulled out. I had the intention to stop them and jump in between the car and pull the pin that connects them up. Mr. Loitz got off the car, facing the train, went around to the front, and started the car again. He had killed the motor. As he came up, went around to the front, got on the opposite side of the driver's seat, I dropped the pin back in again, on account I thought he was going to beat it. He threw over the disc spark and gas levers wide open, and grabbed for the throttle. I seen the train was going to hit me if I did not get out of the way, and I jumped back, and hollered to Bill, 'Jump, Bill.' The last I seen him, he moved his left foot out of the way, and then the train struck.''

This witness also testified that the clutch was in, and presumably the motor car was in motion; that the speed of the train was about 35 miles per hour; and that it did not slow up until after the train struck the motor car. He further says:

"I was there in time to help set the car off, and I pulled the pin out; but Loitz probably lost his head then.''

He says that Loitz was in great danger, and the car was in great danger; that Loitz was apparently trying to get the car out of the road and save it. This witness testifies · further that there was an interval of about two minutes between the time the train came around the curve and the time Loitz was hit. This witness also says, as does the foreman, that they had torpedoes and flags in the motor car, but that none were put out.

The foreman says that he did not instruct deceased to put any flags up that particular day, and did not send him up to set any torpedoes. The first attempt made to signal the train was after it came around the curve, and Johnson ran out into the road and waved it to stop. When the train struck the trailer, the motor car was about 15 feet from the cattle guard. Loitz was thrown off the side, and was lying at the cattle-guard fence; was thrown forward in the direction that the train was going, and about 15 feet from the rail. He lived about 45 minutes. The motor car and trailer were stopped by a man farther down the track about a half a mile, who jumped on the trailer and stopped it. The motor car was then running under its own power, with the clutch in. The motor car had a friction drive, consisting of two discs, and the engine had to be cranked in front to start it. When the motor car and the trailer left Lorimor, they were pushing the trailer ahead of the motor car, so that, after picking up the tackle blocks and starting towards the crossing, the motor car was running forward. There was a sort of wooden cover in the center of the car. The levers were on the left-hand side of the car. The foreman, Johnson, testifies that they went over to Lorimor that morning to get a train line-up.

"That is customary, the purpose being to let us know about where the trains are at. Whenever I got a train line-up, I would give deceased a copy, so he could tell when to look out for it; but this fellow at Lorimor was kind of obstinate,— wouldn't give us any line-up. Never got any train line-up that day."

The number of trains varied each day.

1. The rule contended for by appellant is stated thus (quoting from *Nelson v. Northern Pac. R. Co.*, 50 Mont. 516 [148 Pac. 388]):

1. MASTER AND SERVANT: Workmen's Compensation Act: presumption as to rejecting master. "It is the rule, recognized by the courts everywhere, that, in order for plaintiff to recover for personal injuries suffered by reason of a breach of duty owed to him by defendant, it is indispensably necessary that he allege facts and circumstances disclosing such breach of duty, and also establish by his evidence that it was the proximate cause of his injury."

The rule in the instant case is that the defendant must exonerate itself from all fault, and has the burden of proving that the injury was not the result of its negligence, and that its negligence was not the proximate cause of the injury. Both negligence and proximate cause are presumed. Section 2477-m (4) [d]; Code Supplement, 1913; *Mitchell v. Phillips Min. Co.,* 181 Iowa 600; *Mitchell v. Swanwood Coal Co.,* 182 Iowa 1001; *Mitchell v. Des Moines Coal Co.,* 182 Iowa 1076; *Hunter v. Colfax Consol. Coal Co.,* 175 Iowa 245, 253. Appellant also cites *Mitchell v. Phillips Min. Co.,* supra, and *Meyer & Bros. v. Houck,* 85 Iowa 319, to the point that, in some cases, the evidence on the part of defendant may be so convincing or indisputable as to show that a verdict against the defendant should not stand, and that in such case it is the duty of the court to direct a verdict. This may be so, in exceptional cases. The statutory presumption is more than a mere scintilla of evidence. The force of the presumption is stated in the Iowa cases before cited. Furthermore, from the evidence before set out, the jury could have found that the defendant was negligent, and that such negligence was shown, in addition to the presumption from the injury. For instance, the jury could have found that flags or torpedoes should have been placed, and that such negligence preceded and brought about the emergency in which deceased found himself at the crossing, when attempting to save the motor car of the defendant and possible wrecking of the train, by either removing the motor car from the track or making a run for it. It is evident that that is what deceased was trying to do. Defendant's evidence shows that, when Loitz was at the crossing, he and the defendant's car were in great danger. A proper construction of the order given him by the foreman, "to get off and get clear," justified deceased in attempting to outdistance the train, if there was not time to set the motor car off the track. It is true, as contended by appellant, that the parties were working at the place temporarily; but the evidence shows that it had been customary at other times to put out flags or torpedoes. Appellant concedes, as do some of the cases cited, that it was the duty of deceased to try to save its property and the train. We do not understand appellant to rely upon contributory negligence of the deceased. While they plead that the injury was

due to his carelessness, we assume that this is on the theory that the deceased was wholly to blame, and that the defendant was not in any manner at fault. Appellant cites *Nelson v. Northern Pac. R. Co.*, supra; *Woods v. St. Louis & S. F. R. Co.*, (Mo.) 187 S. W. 11; *Lindstrom v. Great Northern R. Co.*, 129 Minn. 512 (152 N. W. 875). These were hand-car cases, wherein, as appellant claims, the facts are somewhat similar to the facts in the instant case. The cases cited are ordinary negligence cases, wherein the actions were directly against the railroad company alleged to have been negligent, and wherein the burden of proof was upon the plaintiff to show negligence, and that the negligence was the proximate cause of the injury, and not, as in the instant case, where the burden is upon the defendant to overcome the statutory presumption of negligence and that the negligence was the proximate cause. It is unnecessary to review at any length the cases cited. In one of them the negligence charged was failure to give a warning signal; but it appeared from the evidence, without dispute, that plaintiff saw the approaching train in ample time to have avoided the injury. In all of them there was the question as to whether the injured employee had time to save himself, either after observing the danger or having been warned thereof. In the instant case, appellant emphasizes the thought, and claims, that, under the undisputed evidence, deceased had ample time to save himself, after he discovered and was warned of his danger. While Peterson, a member of the crew, testifying for defendant, says that he was at the crossing in time to help deceased set the car off, and that there was an interval of about two·minutes between the time the train came around the curve and the time deceased was hit, the jury may have concluded, from all the circumstances shown, that the witness was very wide of the mark. The same witness testifies that the train was going about 35 miles an hour when deceased was hit, and that nothing was done until after the train came around the curve. The distance from the point of the curve to the·crossing was 200 or 210 feet. The train would cover this distance in four or five seconds, instead of two minutes. The jury may well have found that there was not time to set the motor car off. The time was very short. Clearly, as a witness for defendant says, deceased was in great

danger, as was defendant's property; and the deceased was apparently trying to get the car out of the road, and save it.

Without referring to other circumstances, and without further discussion, it is clear that it was a question for the jury as to whether defendant had overcome the presumption of negligence.

2. Appellant argues the question of proximate cause in connection with the question of negligence. The thought is that any negligence of the defendant was not the proximate cause, but that the proximate cause of the accident was the failure of deceased to get off the track in time. This feature of the case is sufficiently covered by the discussion in the preceding division of this opinion. We have referred to the presumption. Ordinarily, proximate cause is a question for the jury. We think it was so in this case.

3. Finally, it is contended by appellant that, even assuming that defendant was negligent, the sum awarded was grossly excessive, and contrary to the instructions of the court, and that the finding was the result of passion and prejudice on the part of the jury. There is no complaint of the instructions of the court. They were not excepted to. Appellant presents figures and circumstances by which it attempts to show the method adopted by the jury in arriving at the verdict, and to show that the damages are too large. The amount does not seem to us shockingly large, considering the age, expectancy, and habits of deceased. A larger amount, under somewhat similar circumstances, was approved in *Richardson v. City of Sioux City,* 172 Iowa 260,—a death case. See, also, *Brause v. Brause,* 190 Iowa 329, and cases cited. There was a conflict in the evidence as to the habits of deceased and his earning capacity. There is no definite or fixed rule as to the amount of damages in such a case. After stating the rule for the measure of damages and the circumstances which the jury could properly consider, the court instructed that, if they found plaintiff entitled to recover, they should award such a sum, and such a sum only, as they believed from the evidence, under the rules as herein stated, would be a fair and reasonable compensation for the loss sustained by the estate. The amount of the damages was peculiarly within the discretion of the jury.

*2. NEW TRIAL: verdict: excessiveness: $3,960.*

No prejudicial error appearing, the judgment is—*Affirmed.*

WEAVER, STEVENS, and FAVILLE, JJ., concur.