L. A. TAYLOR, Appellee, v. JOHN WILLIAMSON et al., Appellants.

**NEW TRIAL:** Grounds—Passion and Prejudice—Exemplary Damages. The principle that an unsustainable assessment of exemplary damages can be rectified only by the granting of a new trial cannot apply to a *general* verdict rendered on a record which justified substantial actual damages; and this is true even though it be conceded, arguendo, that the exemplary damages returned substantially exceeded the actual damages returned.

*Appeal from Hardin District Court.*—G. D. THOMPSON, Judge.

JANUARY 15, 1924.

ACTION to recover damages for assault and battery. Verdict was returned awarding damages against the three defendants in the amount of $3,000. Upon suggestion of the court, plaintiff filed remittitur of $1,000, and judgment was entered for $2,000, from which judgment, defendants appeal.—*Affirmed.*

*W. R. Williams,* for appellants.

*Lundy, Peisen & Soper,* for appellee.

ARTHUR, C. J.—I. Rulings of the court on admission and exclusion of evidence are not attacked. No complaint is made of instructions to the jury. The evidence is conflicting. It is conceded that plaintiff made a case to go to the jury. The errors relied upon for reversal are that the verdict was excessive

and the result of passion and prejudice; and that the court erred in refusing to grant a new trial.

Appellants assert that no actual damages were proved, or that, if any actual damages were proved, the amount thereof was so small that the verdict of $3,000 consisted almost entirely of exemplary damages, and is, therefore, excessive, and that the excessive exemplary damages awarded could not be rectified by a remittitur, and that it was error to refuse a new trial of the case.

II.     To determine the questions involved, we must examine the evidence. The parties are farmers and neighbors, living in the vicinity of Steamboat Rock, Hardin County, Iowa. Defendant Gerald Williamson, who, it is alleged, committed the assault, is 20 years old. Defendant John Williamson is the father of Gerald Williamson. Defendant Howard Perkins is a neighbor, not related to any of the parties, who was at the Williamson home at the time of the trouble.

Appellee testified, in substance, that he was 35 years of age, about five feet four inches tall, and weighed 140 pounds; that, in order to go to and from a farm which he was working, he traveled by the Williamson home; that, in the afternoon of June 3, 1921, he was driving on a road passing the Williamson house, riding on a corn plow; that, as he got near the Williamson house, he noticed an automobile standing in the highway, and saw someone sitting in the car; that, as he was driving by, not having spoken to anyone, and got opposite the automobile, appellant John Williamson came out from behind the automobile, and grabbed his horses, and said, "Get him, Gerald, get him;" that appellant Gerald Williamson ran around the front end of the automobile, and hit him twice in the shoulder and back of the head, at the same time saying, "Now, you God-damn son of a bitch, we got you alone, and we are going to give you a beating;" that, at the time Gerald struck him, he was sitting on the plow seat, with his feet in the stirrups of the corn plow; that, when Gerald commenced hitting him, he disentangled his feet from the stirrups, and jumped to the ground, and backed up against the corn plow; that, when he arose, the seat and an iron strap to which it was fastened, fell to the ground; that appellant Perkins jumped out of his car, and removed the plow

seat, permitting Gerald to move closer upon him; that, about this time, appellant John Williamson let go of the horses, and approached him from the back, and struck him on the back part of his head with his fist, and knocked him into the machinery; that Gerald kept hitting him in the face with his fists, and appellant John Williamson kept on hitting him with his fists; that, at this same time, appellant Perkins picked up the plow seat and swung it, saying, ''I am going to kill you, God damn you, I am going to kill you;'' that appellant would stop for a while, and then begin beating him again; that appellee called to a boy from the industrial school who was working for him, and who was sitting on the corn plow, to help him or get someone to help him; that appellants told the boy that, if he made a move to get off the corn plow, they would beat him up also; that appellant Perkins kept on threatening to strike him with the plow seat; that the Williamsons kept on hitting him and threatening him for about half an hour; that they told him they were going to kill him, that they were going to raise a mob of men and kill every Taylor in the community, and that, if he prosecuted them, they would mob him within three days.

As to his injuries received, appellee testified that his face and head were cut in many places, and the blood ran down his face onto his clothes; that his side and back were cut from being thrown into the machinery, and that, at the time of the trial, he still had scars on his body; that his face and around his mouth and jaws swelled and remained swollen for a week or ten days, and that he was almost unable to talk or eat, and was unable to sleep for several nights; that he was hurt internally in the back, and has never gotten over it, and that it was with great difficulty that he got out of bed in the mornings; that he was unable to do any work for three weeks; that he stayed up at nights for some time, believing that a mob was coming to kill him; that he was not on friendly terms with the Williamsons; that it was appellant Perkins who stated that they were going to mob him; that the industrial school boy, at the time of the trial, had ceased working for him, and he did not know where he was.

Herman Steinfelt testified that, a few days after the trouble, John Williamson told him that Taylor had been making

fun of his son's wireless station, and that "we did just what we should have done," and that he (Williamson) told his wife that day that, if Taylor came alone, he would get a beating.

Tom Eilers testified that he came upon the scene just as Taylor had left, and asked about the trouble; that John Williamson said, "We have given Taylor a beating, and we did just what we should have done."

Ed Baum testified that he met Taylor in the road, leaving the Williamson home; that Taylor's face and head were bleeding; that, when he reached the Williamson home, he stopped and talked with the two Williamsons and Perkins; that Gerald Williamson said, "Taylor would have gotten more of a beating if he hadn't been a coward, and would have come out of the plow, where they could have gotten hold of him."

August Freirichs testified that, several days after the trouble, John Williamson told him that they had given Taylor a beating.

Joe Taylor, father of appellee, testified that he saw his son, the next day after the trouble, and that his face and the top of his head were black and blue all over; that his eyes were black, and his face and head were cut in many places, and that the entire top of his head was purple; that, on the same day, Gerald Williamson told him that they had given Leonard (appellee) a beating, and that they were going to beat his brother Lester, and that they were going to give Leonard another beating.

Mrs. L. A. Taylor, wife of appellee, testified that from her home she could see the parties in the road, where the trouble occurred; that she knew they were having trouble, but could not see what was being done, and could not hear what was being said; that she watched them for nearly an hour; that, when her husband and the boy came home from the place of the trouble, the boy was crying; that her husband's face and head were cut in many places; that his face and head were covered with blood, and his clothes were stained with blood; that she helped her husband wash the blood off his head and face, and change his clothes; that he was bruised and bleeding in a number of places along the legs and in the back, near the kidneys; that he did not sleep very much for several nights; that he had never gotten

over his injuries; that his face was swollen, and he could hardly talk or eat for two or three weeks, and did not work for three weeks, and had never gotten over the injury to his back, and had difficulty in getting up in the mornings; that he had been to see doctors about his back.

R. V. Adams, a photographer, testified to taking some pictures of appellee, soon after the trouble, and identified a photograph, Exhibit B, which was offered in evidence. Witness also testified that, when he took the picture, appellee's face and head were black and blue.

Appellants offered testimony as follows: Appellant John Williamson testified that, when Taylor drove up, he and his son, Gerald Williamson, and Howard Perkins were together, talking; that Perkins was sitting in his car, and he and his son were sitting on the running board of the Perkins car; that, when Taylor came along, Gerald got up, and walked around the end of the car, and told Taylor "he would have to take back what he said, or take a licking;" that Taylor struck at him, and they commenced to fight, and at one time Taylor got hold of his son's hair; that he came around the car, and Taylor struck at him, and hit him once or twice, but not very hard.

Appellant Gerald Williamson testified that:

"When Taylor drove up, I told him he would have to take back what he had said, or take a licking. He [Taylor] struck at me first, and I hit him two or three times in the shoulder. He got hold of my hair, and I told him he was a coward. I knew, when I saw Taylor coming, that either he or I was going to take a licking. I hit him a few times, and he hit me, and father hit him, and Perkins took the plow seat, but did not hit him."

Appellant Howard Perkins testified:

"I was sitting in the car when Taylor came along with his horses and corn plow. Taylor struck the first blow; he struck twice; and Gerald Williamson struck him in the back and in the face. When the plow seat fell to the ground, I picked it up, and stood alongside Taylor, but kept the one end of it on the ground. I admit that I took the seat from the ground, and out of Gerald's way. I knew before Taylor drove up that there was going to be trouble, because Gerald had said that Taylor

was going to take back what he had said, or take a beating. I had had some trouble with Taylor about some corn.''

III. The instructions authorized the jury to assess exemplary damages if they found that defendants were actuated by malice in making the assault. No request was made for special finding. The verdict does not disclose how much the jury awarded as actual damages, and how much for exemplary damages, if any. Reversal is sought upon the proposition that the verdict is the result of passion and prejudice, and is so excessive as to demonstrate such result. We are dealing with a general verdict, returned by the jury upon conflicting evidence. Appellants do not claim that the evidence was not sufficient to support a verdict of some size. From a careful examination of the record, we think the evidence undoubtedly sufficient to permit an award of more than nominal damages. It has been many times said by our court and other courts that it is peculiarly within the discretion of the jury to determine the amount of damages, both actual and exemplary, based upon the evidence. *Brause v. Brause,* 190 Iowa 329. There is no fixed standard by which to determine the amount of damages in such cases. Elements other than physical injuries inflicted may be considered by the jury as bearing upon the amount of damages, such as humiliation, and wantonness and maliciousness of the assault. It is well settled in this state that the verdict of a jury in an assault and battery case, where the evidence permits awarding of more than nominal damages, should not be disturbed because it may be; in the opinion of the court, excessive, unless it is so excessive as to shock the conscience of the court and irresistibly lead to the conclusion that it was due to passion and prejudice. *Brause v. Brause,* supra.

While it may not be said that the *Brause* case is controlling in the instant case, it is helpful in analysis of the propositions involved in the instant case, and strongly supports upholding the verdict under consideration.

IV. We think that the evidence, construed most favorably for the plaintiff, warranted assessment of substantial damages. The evidence strongly tends to show that appellants John Williamson and Gerald Williamson deliberated upon making an assault upon appellee, and when he came along, attacked him, and

inflicted upon him considerable injury. The evidence shows that appellee was beaten and bruised about the face and head by the fists of the Williamsons, and that his legs and back were bruised and injured by being thrust into the machinery of the cultivator, and that he was annoyed and suffered considerably from the treatment and injuries received. We are urged to reverse on the ground that the verdict in the size that it was rendered shows that it was the result of passion and prejudice. We have examined the evidence carefully, and are not prepared to say, under all the facts and circumstances of the case, that the verdict as reduced is excessive, or that it is the result of passion and prejudice.

As before adverted to, the record does not disclose what amount the jury allowed as exemplary damages and what as actual damages. There is no mathematical ratio between actual and exemplary damages. Perhaps in a majority of cases the actual damages allowed are in excess of the exemplary damages; although it does occur that exemplary damages exceed the actual damages. In a proper case,—and we think this is such a case,— a verdict awarding exemplary damages considerably in excess of the actual damages would be sustained. *Brause v. Brause,* `supra; *Union Mill Co. v. Prenzler,* 100 Iowa 540.

It is insisted by appellants that unsustainable assessment of exemplary damages must be rectified by granting a new trial, and cannot be cured by partial remittitur. But, as before stated, the record does not disclose what amount the jury allowed for actual damages, or whether or not there was any amount allowed as exemplary damages. Appellants did not request that forms of verdict be submitted to ascertain assessment of actual damages and exemplary damages separately. Because the court suggested a remittitur of $1,000, we will not conclude by inference that the trial court viewed the verdict as the result of passion and prejudice. Our most recent case involving this proposition is *Kelly v. Muscatine, B. & S. R. Co.,* 195 Iowa 17, wherein the jury returned a verdict for plaintiff for $60,000. The trial court required a remittitur of $20,000 and permitted the judgment to stand. We required a remittitur of an additional $10,000, and permitted the judgment to stand as thus reduced.

We find no reason to disturb the judgment of the trial court, and it is affirmed.—*Affirmed*.

EVANS, PRESTON, and FAVILLE, JJ., concur.