**STURM, RUGER & CO., INC., a Connecticut Corporation, Appellant,**

v.

**Michael James DAY, Appellee.**

**Michael James DAY, Cross-Appellant,**

v.

**STURM, RUGER & CO., INC., a Connecticut Corporation, Cross-Appellee.**

Nos. 3092, 3135.

Supreme Court of Alaska.

April 6, 1979.

Robert L. Richmond of Richmond, Willoughby & Willard, Kenneth P. Jacobus of Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, and Edward L. Lascher, Ventura, Cal. (in association), for appellant and cross-appellee.

H. Bixler Whiting, Fairbanks, for appellee and cross-appellant.

Before BOOCHEVER, Chief Justice, RABINOWITZ, CONNOR and BURKE, Justices, and DIMOND, Senior Justice.

## OPINION

CONNOR, Justice.

This is a products liability case.

Appellee Michael James Day bought a .41 magnum single action revolver on June 1, 1972. The gun had been manufactured two years before by appellant Sturm, Ruger and Company, in August of 1970, but was purchased new by Day.

On July 30, 1972, Day was sitting in the cab of his small pickup truck with two

young friends when he decided to unload his gun. As he was unloading the revolver, the gun slipped out of his hands. When he grabbed for the gun it fired, the bullet striking his leg and causing serious injuries.

The Sturm, Ruger .41 magnum single action revolver had four hammer positions which were described as follows in the instruction booklet provided by the manufacturer:

FIG. 1

```
There are four possible positions in which
the hammer may be placed, as shown on
Figure 1:

1. Hammer resting on firing pin.
2. Hammer resting on safety notch.
3. Hammer resting on loading notch.
4. Hammer resting on full cock notch.

The safety and loading notches are designed
so that the hammer cannot be released from
either of these positions by normally
pulling the trigger.
```

The third page of the instruction booklet accompanying the revolver warned that the gun could be fired from the loading notch position by exerting "excessive pull on the trigger." This warning was set off from the rest of the instructions in a separate box:

> WARNING: This revolver can be fired by excessive pull on the trigger from either the safety notch position, indicated by No. 2 in Figure 1, or the loading notch position indicated by No. 3 in Figure 1.
>
> The loading notch and the safety notch provide only partial security. If these notches are damaged, as they may be by "fanning", they offer no security. Never depend on this or any other mechanical safety device to justify pointing the firearm at any person.
>
> Fanning is unsafe for you and abusive to your revolver.

Day filed suit against Sturm, Ruger and Company. His second amended complaint was based on a theory of strict tort liability, and included a claim for punitive damages. It was Day's contention that the hammer had been on the loading notch and that the gun fired after he accidentally pulled the hammer off that notch, presumably by pulling the trigger as he caught the falling gun.

The jury returned a verdict for the plaintiff, finding specifically that the revolver was designed defectively and that it had a manufacturing defect as well. The jury awarded $137,750.00 in compensatory damages and $2,895,000.00 in punitive damages to the plaintiff.

Sturm, Ruger filed a timely motion for new trial and for judgment notwithstanding the verdict. This motion included a request that the trial judge consider reducing the punitive damages award. The trial judge declined to order any remittitur.[1] This appeal followed.

1. Sturm, Ruger's motion for new trial and for judgment notwithstanding the verdict, filed on June 7, 1976, argued that the amount of punitive damages awarded by the jury could not be sustained because it bore no reasonable relationship to the amount of compensatory damages. Sturm, Ruger's memorandum stated that "the court may consider it appropriate at this stage to order a reduction in the verdict which at a minimum brings the punitive award to a level where it bears some reasonable relationship to the actual damages." At the hearing on Sturm, Ruger's motion for new trial, counsel for Mr. Day objected to any discussion of a remittitur on the ground that the defendant had neglected to file a "motion for remittitur." The judge stated that he would not consider reducing the amount of the verdict in part because there had been no "motion for remittitur."

Thereupon, Sturm, Ruger filed a pleading entitled "Motion in Support of Remittitur" on August 2, 1976. In its accompanying memorandum, Sturm, Ruger pointed out that the issue had been raised earlier, in the post-trial pleadings and in oral argument. The trial judge denied the remittitur motion, ruling that it was not timely under Rule 59(f), Alaska Rules of Civil Procedure.

We believe that this was error. The point was brought to the trial judge's attention fol-

The questions raised by Sturm, Ruger's appeal may be divided into three basic subject areas: comparative negligence, the propriety of certain jury instructions, and punitive damages.

Michael Day, in his cross-appeal, claims that the trial court's refusal to consider the amount of the punitive damage award in calculating attorney's fees was manifestly unreasonable.

## I

### COMPARATIVE NEGLIGENCE

In *Butaud v. Suburban Marine & Sporting Goods, Inc. (Butaud II),* 555 P.2d 42 (Alaska 1976), we held that the doctrine of comparative negligence is applicable in products liability suits. Since the instant case was pending on appeal at the time the second *Butaud* decision was announced, Sturm, Ruger argues that the trial court's refusal to consider any form of comparative fault requires reversal.

■ Sturm, Ruger's principal contentions are that Michael Day was negligent in unloading his gun in the confined spaces of the cab of his pickup truck; in failing to read or to remember the instructions which came with the gun; and, inferentially, in accidentally dropping the gun. On these facts, the trial judge ruled, as a matter of law, that the plaintiff was not negligent.

If the trial court was correct in ruling that the plaintiff's conduct did not amount to negligence as a matter of law, we need not decide whether our holding in *Butaud II* applies to this case. The standard by which we will test the trial court's ruling was stated by Mr. Justice Dimond in *Cummins v. King & Sons,* 453 P.2d 465, 466–67 (Alaska 1969):

"[I]n order to justify submitting to the jury the question of whether the plaintiff himself was negligent, there must be evi-

dence of such negligence. There must be facts from which one could reasonably infer that such negligence existed. As to the quantity of evidence needed, the test is whether the facts and resulting inferences are such that reasonable minds could justifiably have different views on the question of whether the plaintiff had been negligent. If they could, then it would be proper to submit that issue to the jury for its determination under appropriate instructions. If they could not—if reasonable minds could reach only the conclusion that the plaintiff was not negligent—then submitting the issue to the jury would not be justified." [footnote omitted]

In our opinion a jury question was presented. Whether, in unloading a revolver, one who lets it drop out of his hand is negligent is a typical question of fact. It cannot be resolved as a matter of law. It is only in clear instances that negligence questions should be taken from the jury. The manner in which guns should be handled in particular circumstances is not a question of law; the only relevant rule of law is the general duty to act reasonably under any given set of circumstances. We believe that reasonable minds could differ in determining whether the plaintiff was negligent here. Therefore, a jury question was presented. We must reverse and remand for a new trial in which the jury is permitted to consider plaintiff's possible comparative negligence.

## II

### JURY INSTRUCTIONS

■ Sturm, Ruger's next points on appeal concern the propriety of certain jury instructions. Some of appellant's objections require little discussion.[2] Others, however, merit a closer examination.

---

lowing the jury verdict, but prior to the entry of judgment, and was therefore timely under Rule 59(f), which requires that motions to alter or amend a judgment must be served "not later than 10 days after the entry of the judgment." Having raised the issue of excessive damages

in its motion for new trial and for judgment n. o. v., Sturm, Ruger was not required to submit a separate "motion for remittitur."

2. Appellant objects to jury instruction 13, which stated that "[a] defendant manufacturer may be liable under a theory of strict liability

Sturm, Ruger's principal objections are to the instruction which stated that the manufacturer's warnings were not to be considered in determining whether the product was defectively designed or manufactured [3] and to the instruction which told the jury that it was no defense for a manufacturer to show that his product was within the state of the art at the time it was manufactured.[4] The jury was told, however, that these matters could be considered with regard to the punitive damage claim.

Sturm, Ruger objects to the instruction which removed the subject of product warnings from the jury's consideration.[5] The trial judge recognized that the instruction which he gave would not generally be a correct statement of the law. However, he felt justified in removing consideration of the warnings from the jury in this particular case.

The warnings in question told the consumer the hammer could not be released from the safety or loading notches "by *normally* pulling the trigger.*" They also stated that the revolver "can be fired by excessive pull on the trigger from either the safety notch position . . . or the loading notch position. . . . The loading notch and the safety notch provide only partial security. If these notches are damaged . . . they offer no security. . . [A] light accidental blow on the hammer can readily cause the gun to discharge." The trial judge reasoned that even if these warnings had been read and followed, they could not have prevented the accident in which Day was injured from happening. He also was of the opinion that a warning which merely informs the consumer that the product contains a dangerous defect cannot absolve the manufacturer from liability for injuries caused by such defects.

A number of courts have held that the manufacturer's liability is not precluded merely because the danger from his product is obvious. *E. g., Barker v. Lull Engineering Co. Inc.,* 20 Cal.3d 413, 143 Cal.Rptr.

without proof of its own fault or negligence . . . ." Appellant argues that a lay jury is likely to equate "fault" with legal liability, and to allow recovery without finding the defendant liable. When this instruction is read in its entirety, however, appellant's objection loses much of its force. We find that the instruction, taken as a whole, is an accurate statement of the law.

Appellant also objects to this instruction because it failed to tell the jury that defendant is not liable unless plaintiff's injury resulted from a reasonably foreseeable use of the product. The transcript reveals that the trial judge intentionally omitted the element of foreseeability because there was no evidence that the gun was being used in an unforeseeable manner. The judge stated: "I'll find as a matter of law that the gun was being used in a manner which could or should have been reasonably foreseen by the Defendant, that is, it was being unloaded. Defendant should have realized that people would unload the gun. . . ." The judge additionally ruled that it was also reasonably foreseeable that someone might unload a gun while sitting in the cab of a pickup truck. We agree that no jury question of foreseeability was presented.

Appellant further objects to that part of instruction 13 which stated that "[a] product may also be defective if it lacks safety devices necessary to make it reasonably safe." Appellant claims that this instruction is tantamount to directing the jury to find that "lack of safety devices, per se, automatically established de-

fectiveness. We do not agree. The jury was instructed that a product "may" be defective without safety devices. The jury was given other factors to consider in reaching a conclusion on the issue of defectiveness. There was no error.

3. The instruction on warnings read:

"Manufacturer's warnings intended to place a consumer on notice of conditions in the product that may affect its safe use and handling may not be considered by you in determining whether or not the product was defectively designed or manufactured.

"However, you may consider such warnings in considering punitive damages if you find a design defect existed."

4. The state of the art instruction read as follows:

"In determining whether a product is defective for the purpose of strict liability, you are instructed that it is no defense for the manufacturer to prove that his product was within the state of the art at the time of manufacture or that it was designed and manufactured in a manner similar to that used by other manufacturers at the time of production. However, you may consider such evidence if you deliberate the question of punitive damages."

5. See note 3, *supra,* for the text of the instruction.

225, 232, 573 P.2d 443, 451 (1978); *Luque v. McLean,* 8 Cal.3d 136, 104 Cal.Rptr. 443, 448–449, 501 P.2d 1163, 1168–69 (1972); *Micallef v. Miehle Co.,* 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571 (1976); *Palmer v. Massey-Ferguson,* 3 Wash.App. 508, 476 P.2d 713, 719 (1970). We believe that this reasoning applies equally to products whose printed warnings alert the public to hidden dangers as well as to products whose dangers are patently obvious. In a New York case preceding *Micallef v. Miehle, supra,* in which the majority upheld the since-discarded patent/latent distinction, the dissent noted that safety features

> "are rarely there to protect those who are aware of a risk and voluntarily seek to encounter it. Safety features, be they guards, shields or fences, are of primary importance to protect the inadvertent plaintiff—the one who is not paying attention at the moment of the accident. In fact, the duty to provide safeguards is intended largely to protect against just such expected eventualities. Thus, for example, if a plaintiff were to have tripped and, being unable to steady himself, would have fallen towards the unguarded gears, of what value is it to him that the danger is obvious or patent?"

*Meyer v. Gehl Company,* 36 N.Y.2d 760, 368 N.Y.S.2d 834, 835, 329 N.E.2d 666, 667 (1975) (dissenting opinion of Mr. Justice Fuchsberg).

■ The same might be said of a product whose dangers have been pointed out to the user by way of a printed warning. The warnings provided by Sturm, Ruger would not protect the "inadvertent plaintiff" who accidently dropped the gun. Where the most stringent warning does not protect the public, the defect itself must be eliminated if the manufacturer is to avoid liability. *See, Wilk v. Georges,* 267 Or. 19, 514 P.2d 877, 880 (1973); Prosser, *Torts,* at 394–95 (4th ed. 1971); Phillips, *The Standard for Determining Defectiveness in Products Liability,* 45 U.Cincinnati L.Rev. 101, 106 (1977); *see generally* Twerski, Weinstein, Donaher, and Piehler, *The Use and Abuse of Warnings in Products Liability—Design Defect Litigation Comes of Age,* 61 Cornell L.Rev. 495 (1976).

■ Although in certain cases an adequate warning may prevent a product from being deemed defective,[6] the instant case was not of that type. The trial judge did not err in refusing to submit the warnings issue to the jury.

We note that the jury returned special verdicts, finding that the gun was defectively designed and that it was defectively manufactured.[7] Warnings or state of the art evidence could have no bearing on the issue of whether a product had a manufacturing defect, *i. e.,* that it deviated from the manufacturer's intended result.[8] A finding that the product was defectively manufactured and that the manufacturing defect was the proximate cause of plaintiff's injury are together sufficient to establish the manufacturer's liability and to support an award of compensatory damages in this case.[9] But, as set forth above, we must reverse the entire award because the question of comparative negligence was not submitted to the jury.

■ Generally speaking, "state of the art" refers to customary practice in the industry. *See Olson v. A. W. Chesterton*

---

6. *See Restatement (Second) of Torts,* § 402A, comments *h* and *j; Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893, 903 (1975).

7. As to the difference between design defects and manufacturing defects, see *Caterpillar Tractor Co. v. Beck,* 593 P.2d 871 (Alaska, 1979), n. 15.

8. *See, Barker v. Lull Engineering Co., Inc.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 232, 573 P.2d 443, 450 (1978).

9. In some cases, the plaintiff would also have to prove that the injury resulted from a use of the product which was reasonably foreseeable to the defendant. *Barker v. Lull Engineering Co., Inc., supra,* 143 Cal.Rptr. at 234 n. 9, 573 P.2d at 452 n. 9. However, as we have stated above, the trial judge in the instant case correctly ruled as a matter of law that the plaintiff's use of the gun was reasonably foreseeable.

*Company,* 256 N.W.2d 530, 540 (N.D.1977); Phillips, *The Standard for Determining Defectiveness in Products Liability,* 46 U.Cincinnati L.Rev., 101, 115 n. 71 (1977). It is settled that evidence of conformity to industry-wide standards is not always conclusive in negligence actions. As Judge Learned Hand observed in *The T. J. Hooper,* 60 F.2d 737, 740 (2d Cir. 1932),

> "a whole calling may have unduly lagged in the adoption of new and available devices. [The industry] never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission."

In cases predicated upon strict liability, evidence of industry standards has even less probative value. In strict liability actions, the focus is on the condition of the product, not on the conduct of the defendant. *Bachner v. Pearson,* 479 P.2d 319, 325 (Alaska 1970). The trial court was thus stating a generally accepted principle when it instructed the jury that conformity to the state of the art does not constitute a defense to strict liability claims. *See also, Gelsumino v. E. W. Bliss Company,* 10 Ill. App.3d 604, 295 N.E.2d 110 (1973); *Olson v. A. W. Chesterton Company, supra* ; Karazck, *State of the Art or Science, Is it a Defense in Products Liability?,* 60 Ill.B.J. 348 (1972).

■ While not, strictly speaking, a defense in a products liability action, state of the art may be considered in determining whether a product is defective. *See, e. g., Collins v. Ridge Tool Co.,* 520 F.2d 591 (7th Cir. 1975); Traynor, *The Ways and Meanings of Defective Products and Strict Liability,* 32 Tenn.L.Rev. 363, 367, 370 (1965). Thus appellant complains that the state of the art instruction was erroneous and prejudicial, as the jury ought to have been instructed to consider state of the art evidence before deciding whether the product was in fact defective.

■ It is true that the instruction given did not define "state of the art," [10] and its applicability as one factor to be considered in determining whether the product was defective was not made clear to the jury. However, this is not the problem which troubles us the most with the instruction. As we will develop below, the state of the art instruction alone would not require reversal of the entire judgment. But the point raised as to this instruction gives rise to a broader problem: whether the notion of design defect was properly defined for the jury.

In *Caterpillar Tractor Co. v. Beck,* 593 P.2d 871 (Alaska 1979), we adopted the test for design defect liability found in *Barker v. Lull Engineering Co., Inc.,* 20 Cal.3d 413, 143, Cal.Rptr. 225, 573 P.2d 443 (1978). *Barker* contains two alternative tests for design defect, the second of which is a two prong test. Under that test,

> [A] trial judge may properly instruct the jury that a product is defective in design (1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove . . . that on balance the benefits of the challenged design outweighed the risk of danger inherent in such design.

The instructions in the case before us did apprise the jury of the first part of the *Barker* test, but the rest of the instructions contained only the first prong of the second part of the *Barker* test, eliminating the second prong which allows the jury to weigh, in light of the relevant factors, the benefits of the design against the risk of danger inherent in the design. A majority of this court is of the opinion that no jury question was presented on this issue, and that the risk of danger inherent in the design of the product so outweighed the benefits of that design that the superior

---

10. See note 4, *supra,* for the text of the state of the art instruction.

court, if it had considered this question, would have had to enter a directed verdict for the plaintiff.[11] Therefore, the failure to give an instruction on this issue was not error.

## III

### PUNITIVE DAMAGES

Sturm, Ruger urges us to repudiate the doctrine of punitive damages in Alaska on the ground that imposition of punitive damages violates the state and federal constitutions. Appellant also contends that punitive damages should not be awarded as a matter of public policy. In addition, Sturm, Ruger argues that punitive damages have no place in the "fault-free" context of strict products liability.

In the event that we should decline to rule in appellant's favor on the above questions, Sturm, Ruger maintains that the evidence introduced in the instant case was not sufficient to support an award of punitive damages. Appellant also challenges certain evidentiary rulings relevant to the area of punitive damages, and claims that the amount of damages awarded was excessive.[12]

Sturm, Ruger's constitutional arguments, summarized briefly, are that imposition of punitive damages violates due process guarantees because the jury has no standards by which to determine the extent of a defendant's culpability and the amount of damages to be assessed. Appellant further argues that the punitive damages doctrine lends itself to arbitrary application and does not provide fair warning of what conduct will subject a person to punishment.

In *Bridges v. Alaska Housing Authority*, 375 P.2d 696, 702 (Alaska 1962), this court noted that in order to recover punitive or exemplary damages, the plaintiff must prove that the wrongdoer's conduct was "outrageous, such as acts done with malice or bad motives or a reckless indifference to the interests of another." Actual malice need not be proved. Rather, "[r]eckless indifference to the rights of others, and conscious action in deliberate disregard of them . . . may provide the necessary state of mind to justify punitive damages." *Restatement (Second) of Torts*, § 908 (Tent. Draft No. 19, 1973).

In the instant case, the jury was instructed to consider whether the defendant knew its design was defective and had caused injuries or death. The jury was then told that if the defendant "acted with reckless indifference toward the safety of its customers, or that its acts were maliciously or wantonly done," punitive damages could be awarded in addition to compensatory damages. The trial judge cautioned the jury to exercise discretion and reason and not to be motivated by sympathy, bias, or prejudice with regard to the punitive damages question.

We find these standards to be sufficient in order to meet a void-for-vagueness challenge. Other courts have reached the same conclusion when presented with this question. *E. g., Egan v. Mutual of Omaha Ins. Co.*, 133 Cal.Rptr. 899, 914–15 (Cal.App. 1976) and cases cited therein; *Kink v. Combs*, 28 Wis.2d 65, 135 N.W.2d 789, 797 (1965).

We also reject the argument that punitive damages have no place in a strict liability case, although we do agree with appellant that punitive damages ought not be awarded in every products liability case. Where, however, as in the instant case, plaintiff is able to plead and prove that the

11. The author of this opinion and Justice Rabinowitz disagree with the majority on this issue, and would reverse and remand the case for a new trial on this question.

12. Day claims that Sturm, Ruger has waived most of these issues by failing to raise them in the trial court. It is true that Sturm, Ruger did not immediately challenge the propriety of punitive damages in general. However, these points were presented to the trial court in a memorandum filed prior to the submission of the case to the jury. While the better practice would have been to raise these questions earlier in the proceedings, and to have briefed them more thoroughly, we cannot say on the record before us that these points have been waived.

manufacturer knew that its product was defectively designed and that injuries and deaths had resulted from the design defect, but continued to market the product in reckless disregard of the public's safety, punitive damages may be awarded. *See, e. g., Gillham v. The Admiral Corporation*, 523 F.2d 102 (6th Cir. 1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1113, 476 L.Ed.2d 318 (1976); *Toole v. Richardson-Merrell, Inc.*, 251 Cal.App.2d 689, 60 Cal.Rptr. 398 (1967);[13] *Moore v. Jewel Tea Company*, 116 Ill.App.2d 109, 253 N.E.2d 636 (1969), *aff'd* 46 Ill.2d 288, 263 N.E.2d 103 (1970).

Punitive damages are designed not only to punish the wrongdoer, but also to deter him and others like him from similar wrongdoing in the future. *Restatement (Second) of Torts*, § 908(1) (Tent. Draft No. 19, 1973). We believe that as a matter of public policy, punitive damages can serve several useful functions in the products liability area.[14] For example, the threat of punitive damages serves a deterrence function in cases in which a product may cause numerous minor injuries for which potential plaintiffs might decline to sue, or in cases in which it would be cheaper for the manufacturer to pay compensatory damages to those who did present claims then it would be to remedy the product's defect. In addition, if punitive damages could not be awarded in the products liability context, a reckless manufacturer might gain an unfair advantage over its more socially responsible competitors. On balance, we find the arguments advanced by appellant in favor of its position to be outweighed by the sound public policy considerations supporting the imposition of punitive damages in appropriate cases. We therefore decline to jettison the doctrine of punitive damages in this area of the law.

■ We turn next to Sturm, Ruger's claim that there was insufficient evidence to sustain the jury's award of punitive damages. The evidence presented at trial indicated that top officials at Sturm, Ruger knew that the safety and loading notches of their single action revolver presented a danger of accidental discharge because of the propensity of the engaging middle parts to fail or break. The evidence also reflects knowledge on the part of Sturm, Ruger management that serious injuries had resulted from this deficiency, coupled with procrastination in changing the basic design, at an increased cost of $1.93 per gun. Because we find that fair-minded jurors in the exercise of reasonable judgment could differ as to whether Sturm, Ruger's actions amounted to reckless indifference to the rights of others, and conscious action in deliberate disregard of them, thereby evidencing a state of mind which could justify the imposition of punitive damages, we will not upset the jury's conclusions that punitive damages were warranted.

Sturm, Ruger next contends that the punitive damage aspect of the case was plagued by evidentiary and procedural errors.[15] Having carefully reviewed the relevant portions of the record, we conclude that no reversible error was committed.

■ Appellant's final contention regarding punitive damages is that the amount

---

**13.** *Contra, Roginsky v. Richardson-Merrell*, 378 F.2d 832 (2d Cir. 1966), a case involving the same course of conduct by the same manufacturer. A three-judge panel, with one judge dissenting, found insufficient evidence to warrant submitting the question of punitive damages to the jury. Like the California court in *Toole*, we take note of the *Roginsky* case, while declining to follow the Second Circuit's lead.

**14.** *See generally*, D. Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich.L.Rev. 1258 (1976). Professor Owen systematically examines and refutes each argument which has been proposed for not allowing punitive damages in products liability cases.

**15.** The contentions were that evidence of the company's gross wealth and of William Ruger's personal financial condition was erroneously admitted; that evidence which tended to militate against or reduce punitive damages was erroneously excluded; and that the trial court erred in admitting evidence of certain other accidents and lawsuits involving Sturm, Ruger guns. In addition, appellant argued that the jury was uninstructed on some aspects of the law relating to punitive damages, and misinstructed on others.

48

awarded was excessive. We have previously held that the decision to order a remittitur or a new trial rests within the sound discretion of the trial court. *E. g., Haskins v. Shelden*, 558 P.2d 487, 494 (Alaska 1976), and cases cited therein. We will not interfere with the trial court's decision unless we are "left with a firm conviction on the whole record that the trial judge made a mistake in refusing to order a remittitur or grant a new trial," *City of Nome v. Ailak*, 570 P.2d 162, 173 (Alaska 1977) (footnote omitted), and where intervention on our part is necessary to prevent a miscarriage of justice.

 One means of determining if an award of punitive damages is excessive is to compare it with the amount of actual damages. Professor McCormick observes:

"The punitive damages given, it is said, must bear some reasonable proportion to the actual damages. As a rough working scale, this is better than nothing." [footnotes omitted]

McCormick, *Law of Damages*, Sec. 85, 298 (1935). Exemplary damages may exceed the actual damages, however, and no definite ratio between them is prescribed. *Taylor v. Williamson*, 197 Iowa 88, 196 N.W. 713 (1924). Other important factors which bear on the question include "the magnitude and flagrancy of the offense, the importance of the policy violated, and the wealth of the defendant." *Zhadan v. Downtown L. A. Motors*, 66 Cal.App.3d 481, 136 Cal.Rptr. 132, 143 (1976).

In his comprehensive law review article, *Punitive Damages in Products Liability Lit-*

*igation*, 74 Mich.L.Rev. 1258 (1976), Professor Owen argues cogently that while punitive damages should be awarded in appropriate cases, the awards should be subjected to greater scrutiny than in many cases in the past. Indeed, he finds a recent trend toward tightened judicial control over punitive damages. *Id.* at 1321.[16] Moreover, judicial scrutiny over the awards provides a partial justification for allowing such awards in the first place. The spectre of bankruptcy and excessive punishment can be in part dispelled to the extent that trial and appellate courts exercise their powers of review.[17]

 The compensatory damages awarded to Michael Day and against Sturm, Ruger amounted to $137,750, exclusive of costs, prejudgment interest, and attorney's fees. The punitive damage award of $2,895,000 appears to be so out of proportion to the amount of actual damages as to suggest that the jury's award was the result of passion or prejudice. The jurors apparently responded to an invitation to punish Sturm, Ruger for all wrongs committed against all purchasers and users of its products, rather than for the wrong done to this particular plaintiff. *See, Egan v. Mutual of Omaha Ins. Co.*, 133 Cal.Rptr. 899, 919–20 (Cal.App. 1976). Under the circumstances, it was a mistake and an abuse of discretion for the trial judge not to have reduced the punitive damages or to have ordered a new trial.

After a careful review of the evidence and all of the factors which should bear upon this determination, it is our opinion

16. He gives as an example *Jolley v. Puregro Co.*, 94 Idaho 702, 496 P.2d 939 (1972). The trend can also be seen by comparing the original *Restatement of Torts* with the newer version. *See Restatement (Second) of Torts*, Sec. 908, comment *d.*, at 81–82 (Tent. Draft No. 19, 1973).

17. Among the factors which, according to Professor Owen, should be taken into account are:
"(1) the amount of the plaintiff's litigation expenses;
(2) the seriousness of the hazard to the public;
(3) the profitability of the marketing misconduct (increased by an appropriate multiple);

(4) the attitude and conduct of the enterprise upon discovery of the misconduct;
(5) the degree of the manufacturer's awareness of the hazard and of its excessiveness;
(6) the number and level of employees involved in causing or covering up the marketing misconduct;
(7) the duration of both the improper marketing behavior and its cover-up;
(8) the financial condition of the enterprise and the probable effect thereon of a particular judgment; and
(9) the total punishment the enterprise will probably receive from other sources."

that if punitive damages are awarded at a second trial, on essentially the same evidence as that presented in the first trial, they should not exceed $250,000. That amount is quite sufficient to achieve the deterrent purposes to be served, without at the same time inflicting a penalty disproportionate to the defendant's wrong.[18]

Of course, at any new trial the court should permit the jury to make the initial determination of punitive damages. If essentially the same evidence as that presented at the first trial is presented at the second trial, and if the jury's award exceeds $250,000, the court should then exercise its power to grant remittitur in accordance with this opinion.

In summary, we reverse the award of compensatory damages, and remand for a new trial as to both compensatory and punitive damages. We need not address the question of attorney's fees raised by appellee on cross-appeal.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

DIMOND, Senior Justice, dissenting in part.

BURKE, J., dissenting in part.

MATTHEWS, J., not participating.

DIMOND, Senior Justice, dissenting in part.

The court holds that whether, in unloading a revolver, one who lets it drop out of his hand is negligent is a typical question of fact for determination by a jury, and cannot be resolved as a matter of law.

The evidence in the case was to the effect that Day was holding the revolver with both hands between his legs, with the gun pointing toward the floor of the pickup in which he was sitting. While he was unloading the gun, the hammer was resting on the loading notch, which was designed so that the hammer could not be released from that position by normally pulling the trigger.

The gun started to slip, Day grabbed it and it fired.

These facts establish nothing more than that the gun slipped and Day grabbed it, obviously to prevent the gun from hitting the floor of the pickup, and that the gun then fired. From these facts, there is no inference that Day was negligent—that he had failed to exercise reasonable prudence for his own safety. Accidents may happen in the absence of negligence. *Cummins v. King & Sons*, 453 P.2d 465, 467 (Alaska 1969). An object, such as a fairly heavy revolver, may slip from one's hands without there being any failure on one's part to have exercised reasonable prudence to avoid having that happen. In order to create an inference of lack of reasonable prudent care in such a situation, there must be facts from which such inference may logically be deduced. There were no such facts presented in this case.

One might suggest that the reason the gun fired was because Day's finger engaged the trigger when he grabbed the gun to prevent it from falling to the floor. If the hammer had been on the full cock notch, then this would indicate carelessness on Day's part because the gun was designed to fire in this situation. But this was not the case. The hammer was resting on the loading notch position which, like the safety notch, was designed so that the hammer could not be released by normally pulling the trigger. Day was engaged in unloading the pistol at the time, and the hammer was in precisely the position it was supposed to be for loading or unloading. There is here no inference of negligence on the part of Day.

The facts presented at the trial and the resulting inferences are such that reasonable persons could not justifiably have different views on whether Day was negligent in his handling of the gun, but could only reach the conclusion that Day was not negligent. *Cummins v. King & Sons*, 453 P.2d 465, 466–67 (Alaska 1969). In my opinion,

---

**18.** We recognize also that an award of punitive damages serves to reward the private plaintiff for enforcing the rules of law against one who otherwise would not be coerced into observing those rules.

the trial judge was correct in not submitting this issue to the jury.[1]

BURKE, Justice, dissenting in part.

I think the trial judge's refusal to allow the jury to consider Sturm, Ruger's claim that Day's injury was due, all or in part, to his own negligence was correct. Thus, on that issue I join in the dissenting opinion of my esteemed colleague, Senior Justice Dimond. I also disagree with the majority's conclusions that the jury's award for punitive damages was the result of passion or prejudice and that it was an abuse of discretion for the trial judge not to have reduced the award or ordered a new trial.

The trial court instructed the jury that it could return a verdict for punitive damages for injuries caused by a design defect only upon a finding "that [Sturm, Ruger] acted with reckless indifference towards the safety of its customers, or that its acts . . were maliciously or wantonly done." The jury concluded that Sturm, Ruger's conduct came within that instruction, and the record certainly supports such a conclusion. As to the amount of the award, the formula that the jury apparently used suggests to me that its verdict was the result of careful deliberation and a keen sense of justice, rather than impermissible passion and prejudice.

The evidence showed that Sturm, Ruger manufactured over 1,501,000 revolvers of the type causing Day's injury. Sturm, Ruger's profit from the manufacture and sale of those firearms alone was enormous, totalling many millions of dollars. At trial, William Ruger, the president and founder of Sturm, Ruger, testified that redesign of the revolver to cure the defect cost approximately $199,000 and that the increased manufacturing cost per revolver was $1.93. The figure agreed upon by the jury as an appropriate award for punitive damages equalled the amount of the increased manufacturing cost per item multiplied by the approximate number of revolvers sold: $1.93 \times 1,500,000 = \$2,895,000$. Thus, the amount of the award is roughly equal to the profit directly attributable to Sturm, Ruger's callous disregard for the safety of its customers. Such being the case, I think there is no merit to the contention that the figure was the result of improper passion or prejudice. Certainly, the amount of the punitive damage award far exceeded Day's actual damages. However, given the purpose of punitive damages, the award was not excessive.

As to all other issues, I concur in the views expressed by the majority. Thus, I would affirm the judgment of the superior court.

---

1. I would reach the same result even if, under the facts presented at the trial, one could reasonably infer that Day had failed to exercise ordinary care for his own safety. In *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871 (Alaska, 1979), I took the position, contrary to that of the majority of the court, that

> in a product liability action where there is a defect in the manufactured product and the danger of using the product in such condition is apparent to the plaintiff, a degree of fault may be attributed to the plaintiff to reduce

the damages to which he or she would be entitled only where his or her use of the product is highly unreasonable, or where there has been a substantial departure from the ordinary care expected of the reasonably prudent person in like circumstances. [footnote omitted]

Certainly, it cannot be said here that Day's handling of the pistol while unloading it constituted such an aggravated form of fault on his part so as to open the door to the application of the principles of comparative negligence.