655 P.2d 32

**Steven D. HOHLENKAMP,**
**Plaintiff/Appellant,**

v.

**RHEEM MANUFACTURING COMPANY,**
**Defendant/Appellee.**

**No. 2 CA–CIV 3973.**

Court of Appeals of Arizona, Division 2.

June 28, 1982.

Rehearing Denied Sept. 24, 1982.

Review Dismissed by Supreme Court Oct. 29, 1982.

---

**2.** Arizona Rule 54(b), Rules of Civil Procedure,

16 A.R.S. is the same as the Federal Rule.

Haralson, Kinerk & Morey, P.C. by Carter Morey, Tucson, for plaintiff/appellant.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Robert G. Beshears, Leslie E. O'Hara and Charles J. Muchmore, Phoenix, for defendant/appellee.

OPINION

HOWARD, Chief Judge.

This is the second round in this court for this products liability case involving a water heater. In the case of *Hohlenkamp v. Rheem Manufacturing Company,* 123 Ariz. 535, 601 P.2d 298 (App.1979), we reversed a summary judgment in favor of the manufacturer.

The trial record shows that in February 1958, Mr. and Mrs. Hohlenkamp purchased and took up residence in their new home in Tucson. It contained a Rheem gas-fired hot water heater which was located in a 6′ × 10′ utility-storage room along with a washing machine and a furnace. For the four years prior to the fire which occurred in this case, Mr. Hohlenkamp also kept a gas-powered lawnmower and a can of gasoline in the room.

Adjacent to the utility room, Mr. Hohlenkamp had constructed a screened-in porch area. On May 22, 1962, Steven Hohlenkamp was playing in this screened-in porch area when Mrs. Hohlenkamp heard a "terrible whoosh" and "the whole house shook." She immediately ran to the porch and found her son, Steven, engulfed in flames.

The Tucson Fire Department determined that the cause of the blaze was the ignition of flammable gasoline vapors by the pilot light on the Rheem water heater. At the time of this investigation the gasoline can which Mr. Hohlenkamp kept in the utility room was found on its side three feet from the water heater. The cap to the gas can was off and the can was charred on the three exposed sides but had neither exploded nor imploded as a result of the fire. There was a conflict in the evidence as to whether the fire was caused by the seepage of gasoline fumes from the lawnmower gas tank or by gasoline spilled from the can.

Appellant presented expert testimony that the water heater was defective in design because it did not have a flame arrestor screen (Davy screen) to prevent flashback explosions and because the water heater did not contain a warning about the dangers of storing flammable substances in

or about the area where the water heater was located. Appellant further presented testimony that the general lay public does not know that gasoline fumes are heavier than air and can leak out from gasoline cans and lawnmower tanks, run along the floor for long distances and be sucked into the pilot light and burner area of a hot water heater because of a draft created by the heater's design and operation.

Mr. and Mrs. Hohlenkamp were aware that the hot water heater had a constantly burning pilot light and Mr. Hohlenkamp lit the pilot light himself on at least two occasions when the wind had blown it out. He also knew from his automotive background that gasoline or any flammable liquid should not be stored near an open flame, that gasoline was dangerous when it was in a vaporized form and that gasoline fumes were heavier than air. However, there was also testimony that Mr. Hohlenkamp did not understand that gasoline fumes could be sucked into the pilot light by the draft created in the design and operation of the heater.

Appellant presented evidence that water heater manufacturers had knowledge before the Hohlenkamp accident of the danger presented in residential homes by vapor-like substances coming in contact with the open flame at the bottom of their water heaters. Evidence was also presented that flame arrestor screens had been patented in this country since the beginning of the century and were used widely throughout the petroleum and gasoline industry to prevent flashback explosions.

Rheem put on expert testimony that the Davy screen has never been incorporated into the design of a gas-fired water heater of any make. Several defense experts testified that the use of the screen would significantly increase the risk associated with a hot water heater because the screen would tend to act as a filter and if it became clogged, carbon monoxide poisoning would result. Expert testimony was also presented by Rheem that different types of flammable vapors required different size pores or holes in the Davy screen device in

order to prevent fire. Thus, a particularly sized Davy screen would not prevent the ignition of all flammable vapors that could be present in or around a water heater. They also testified that the screen itself, if in contact for a period of time with a flammable vapor, would eventually glow red and become an ignition or detonation force in itself. Rheem also presented testimony that it had no notice of any similar accident involving one of its water heaters igniting a flammable vapor until it received notice of the lawsuit in 1975.

After both sides had rested, the trial judge granted Rheem's motion for a directed verdict on the issue of strict liability for design defect. The case then went to the jury on two theories of liability, strict liability for failure to warn and negligence for a design defect.

Appellant contends that the trial court erred in (1) directing a verdict on the strict liability design defect issue; (2) admitting evidence of industry standards and state of the art; and (3) granting appellee's motion to exclude evidence of warning labels placed on Rheem's water heaters in 1978 which warned against storing flammable material near water heaters.

## I. DID APPELLEE PROVE A STRICT LIABILITY CASE FOR A DESIGN DEFECT?

■ There is strict liability for a design defect if the product is in a defective condition. A defective condition is a condition not contemplated by the ultimate consumer which will be unreasonably dangerous to him. The term "unreasonably dangerous" means "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Brady v. Melody Homes Manufacturer,* 121 Ariz. 253, 589 P.2d 896 (App.1979) and see, *Moorer v.*

*Clayton Manufacturing Corporation,* 128 Ariz. 565, 627 P.2d 716 (App.1981).

■ In *Brady v. Melody Homes,* supra, the court recognized that there are two types of design defects. The design defect which forms the basis of a claim in strict liability views the defect from the viewpoint of the consumer. The design defect upon which a negligence claim can be based views the defect from the standpoint of the manufacturer. As the reasoning in *Brady* discloses, when faced with a design defect, in order to determine whether the claim for relief is based on strict liability or negligence, one must ask whether the product, because of the alleged design defect, is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."[1] 121 Ariz. at 257, 589 P.2d 896. If reasonable minds could differ on the answer to this question, or if the answer is in the affirmative, a claim for relief is based on strict liability. If the answer is in the negative, the defect must be judged upon negligence principles using the standard of a reasonably prudent manufacturer.

We pose the strict liability "test question." Would the ordinary consumer know that the water heater had an open pilot light and appreciate the fact that the light could cause a fire if gasoline fumes came in contact with it?[2]

In the earlier case of *Hohlenkamp v. Rheem Manufacturing Company,* supra, we observed:

"In the instant case, it would at first blush appear that a gas-fired appliance with a constant pilot light presents an open and obvious danger to combustibles. However, the expert testimony indicates that misapprehension as to the characteristics of volatile vapors and the danger

---

**1.** See Restatement (Second) of Torts § 402A, Comment *i.*

**2.** Relying on *Brady v. Melody Homes,* supra, appellees contend that the strict liability test question is: Would the ordinary consumer ex-

pect that there was a Davy screen to protect the open flame? We do not believe that *Brady* stands for the proposition that the ordinary consumer must contemplate a specific, esoteric safety device.

inherent in bringing items that may exude such into an area where a pilot light burns is common. The common practice of using utility storage rooms, frequently containing water heaters, for storing items of all types, including combustibles, was also brought out. Furthermore, the flame of the pilot light is generally out of sight and the danger is hidden from view, perhaps frequently forgotten, and in the case of some individuals, not even recognized." 123 Ariz. at 537, 601 P.2d 298.

■ We are unable, as a matter of law, to answer the strict liability "test question" in the affirmative or negative because we believe reasonable minds could differ. The issue was, therefore, a strict liability issue, and if the jury believed there was a design defect, but that the defect was not "unreasonably dangerous" within the meaning of Restatement (Second) of Torts § 402A, then the issue sounded in negligence. The trial court erred in not letting the issue of strict liability for design defect be decided by the jury.

## II. EVIDENCE OF INDUSTRY STANDARDS AND STATE OF THE ART IN STRICT LIABILITY CASES

■ Since the cause of action accrued prior to September 3, 1978, state of the art was not a defense. See *Moorer v. Clayton Manufacturing Corporation,* supra; A.R.S. § 12–683(1). Appellee was allowed to present evidence that it complied with all the standards of the American National Standard Institute. Did the trial court err when it allowed evidence of industry standards and state of the art into evidence? We think not. While state of the art is not, strictly speaking, a defense in strict liability actions, it may be considered in determining whether a product is defective. *Bruce v.*

*Martin-Marietta Corporation,* 544 F.2d 442 (10th Cir.1976); *Sturm Ruger & Co., Inc. v. Day,* 594 P.2d 38 (Alaska 1979); see Traynor, The Ways and Means of Defective Products in Strict Liability, 32 Tenn.L.Rev. 363, 367, 370 (1965). As the court in *Bruce v. Martin-Marietta Corporation,* supra, has put it:

"... there is 'general' agreement that to prove liability under § 402A the plaintiff must show that the product was dangerous beyond the expectations of the ordinary consumer. State-of-art evidence helps to determine the expectation of the ordinary consumer. A consumer would not expect a Model T to have the safety features which are incorporated in automobiles made today. The same expectation applies to airplanes. Plaintiffs have not shown that the ordinary consumer would expect a plane made in 1952 to have the safety features of one made in 1970. State-of-art evidence was properly received and considered by the trial court." 544 F.2d at 447.

■ Industry standards have also been found to be admissible in strict liability cases on the ground that these standards often constitute substantive evidence on the strict liability issue of whether a product is in a defective condition, unreasonably dangerous to the user. *Union Supply Company v. Pust,* 196 Colo. 162, 583 P.2d 276 (1978), involved a claim for damages based on strict liability in tort for design defect and failure to warn. On appeal, the manufacturer of the conveyor belt in issue claimed error in the trial court's admission of nongovernmental conveyor belt codes. The lower court had allowed the standards to be admitted on the issue of whether the conveyor was in a defective condition. In affirming, the appellate court stated: [3]

**3.** In accord: *Hubbard v. McDonough Power Equipment, Inc.,* 83 Ill.App.3d 272, 38 Ill.Dec. 887, 404 N.E.2d 311 (1980); *Price v. Buckingham Manufacturing Co.,* 110 N.J.Super 462, 266 A.2d 140 (1970); see Frumer and Friedman, "Products Liability" § 16A[4][i] at 3B–174 et seq. See also *Thibault v. Sears Roebuck & Company,* 118 N.H. 802, 395 A.2d 843 (1978); *Nordstrom v. White Metal Rolling and Stamp-*

*ing Corporation,* 75 Wash.2d 629, 453 P.2d 619 (1969), on the reliability and substantive use of industry codes (standards of the American Standards Association). And see *Rucker v. Norfolk & Western Railway Company,* 77 Ill.2d 434, 33 Ill.Dec. 145, 396 N.E.2d 534 (1979), which held that compliance with federal safety regulations is admissible in a strict liability case to show whether the product is defective

"In our view, these safety standards are relevant, especially in design defect cases. In cases of defects in manufacture, the jury is frequently able to judge the defective item by comparing it to others similarly produced by the manufacturer. However, as the California Supreme Court has noted: '... A design defect, by contrast, cannot be identified simply by comparing the injury-producing product with the manufacturer's plans or with other units of the same product line, since by definition the plans and all such units will reflect the same design.' *Barker v. Lull Engineering Co., Inc.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443. By reason of the nature of the case, the trier of fact is greatly dependent on expert evidence and industry standards in deciding whether a defect is present.

\* \* \* \* \* \*

These codes were formulated by groups of experts in the conveyor designing and manufacturing field, and were approved by many organizations. They are likely to be more probative than a single learned treatise or an expert opinion, as they represent the consensus of an entire industry. There is no motive for the formulators to falsify, and there is no danger that the standards will be subsequently altered or incorrectly remembered by a witness. Finally, since we require that the safety standards be introduced through an expert witness, the average party will have a fair opportunity to cross-examine the experts on any inconsistencies, misrepresentations or other limitations of the standards. Given these guarantees of trustworthiness, we approve the admission of industry safety codes as substantive evidence on the strict liability issue of whether a product is in a 'defective condition unreasonably dangerous.' [citations omitted]" 583 P.2d at 286–287.

The evidence of industry standards was introduced here by an expert witness as required by the Colorado court in the *Pust* case. There was no error by the court in admitting evidence of state of the art and industry standards for the limited purpose of showing whether the product was defective and unreasonably dangerous.

### III. EVIDENCE OF WARNING LABELS PLACED ON WATER HEATERS IN 1978

■ Appellee moved in limine to exclude evidence of warning labels placed on Rheem water heaters in 1978 which warned against storing flammable materials near water heaters. This motion was granted by the trial court over appellant's objection. Also, after appellee's expert witness Dr. McCarthy testified, Rheem moved to strike that part of his testimony discussing whether or not there are current warnings on Rheem or other water heaters. Rheem also moved to preclude Hohlenkamp's counsel from making reference to warnings on water heaters at the date of the trial and specifically to the existence of warnings on Rheem water heaters because there was no competent evidence that there were any warnings on Rheem water heaters. Rheem's motion in limine was based on Rule 407, Arizona Rules of Evidence, 17A A.R.S. which states:

"When, after an event, measures are taken, which if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence or subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of the precautionary measures, if controverted, or impeachment."

Citing the case of *Ault v. International Harvester Company*, 13 Cal.3d 113, 117 Cal. Rptr. 812, 528 P.2d 1148 (1974), the appellant contends the trial court erred in sus-

or unreasonably dangerous and that such admission does not focus the inquiry on conduct

rather than the product.

taining the motion in limine. In support of his argument, appellant argues that Rule 407 only bars the evidence when one is trying to prove negligence or culpable conduct and that the rule does not apply to a strict liability case.[4] We do not agree. The Fourth Circuit Court of Appeals exhaustively discussed the application of Rule 407 (the federal rule) to product liability actions in the case of *Werner v. Upjohn Company, Inc.*, 628 F.2d 848 (4th Cir.1980), cert. denied 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804. The *Werner* court distinguished the case relied upon so heavily by appellant here, *Ault v. International Harvester,* supra:

"The defendant argues that we should adopt the rule of some courts, that the rule against admitting evidence of subsequent remedial measures not apply in product liability cases. See *Ault v. Int'l Harvester,* [citations omitted]. We are not persuaded. The court assumes that the product is defective, and thus overlooks the situation where the product is not defective but could be made better. A manufacturer who undertakes precautionary measures in this setting will face the risk of liability for an injury caused by the earlier nondefective version of the product based on evidence of his subsequent act which made the product safer but in no way supports an inference that the initial version of the product was defective. Furthermore, if the rationale of *Ault* were applied in federal courts it might effectively override Rule 407 since its reasoning that evidence of subsequent precautionary measures is admissible in product liability cases might apply with equal force to a negligence cause of action. However, Congress, in enacting Rule 407, has chosen to exclude such evidence as proof of negligence and the *Ault* court offers no basis for distinguishing between the two theories. *Smyth v. Up-*

*john Company, Inc.,* 529 F.2d 803 (2nd Cir.1975) rejects the holding of *Ault* as do we. [footnote omitted.]

Our conclusion is supported by the close similarity between negligence and strict liability. The elements of both are the same with the exception that in negligence plaintiff must show a breach of a duty of due care by defendant while in strict liability plaintiff must show that the product was unreasonably dangerous. The distinction between the two lessens considerably in failure to warn cases since it is clear that strict liability adds little in warning cases. Under a negligence theory the issue is whether the defendant exercised due care in formulating and updating the warning, while under a strict liability theory the issue is whether the lack of proper warning made the product unreasonably dangerous. Though phrased differently the issue under either theory is essentially the same: was the warning adequate? (citations omitted)" 628 F.2d at 857–58.

In *Krueger v. Tappan Company,* 104 Wis.2d 199, 311 N.W.2d 219 (App.1981), the Wisconsin court was faced with a failure to warn issue in context with its Rule 904.07 Stats., which is identical to our own Rule 407. The Wisconsin court first of all recognized that the *Ault* case was not a failure to warn case but was a case involving product design.[5] The Wisconsin court in ruling that its Rule 904.07, Stats., prohibited introduction of a subsequent warning stated:

"Strict liability under sec. 402A of the *Restatement* arises only where the defective condition of the product makes it unreasonably dangerous, and a product sold without an adequate warning of danger is in a defective condition. Comment *h* at 351–52; comment *j* at 353. Notwithstanding that apparent merging of defective design and inadequate warning in

---

**4.** A.R.S. § 12–686(2) which was not in effect on the date of this accident prohibits, in any product liability action, evidence of subsequent changes in order to prove a defect.

**5.** In *Embry v. General Motors Corporation,* 115 Ariz. 433, 565 P.2d 1294 (1977), we held that

the failure to warn comes into play in a strict liability case when the product is perfectly manufactured and meets every requirement for its design utility but nevertheless is unreasonably dangerous because of a failure to warn of its dangerous characteristics.

the 'condition' of the product, the duty to warn arises if the seller has, or should have, knowledge of a dangerous use. Comment *h* at 351–52; comment *j* at 353.

Whether the seller had or should have had knowledge of a dangerous use prior to the plaintiff's injury necessarily shifts the focus back to the seller's conduct in a strict liability case based on a claimed failure to warn. [footnote omitted] Courts of some jurisdictions have noted this distinction and found it to be grounds for holding evidence of a subsequent warning inadmissible. [citations omitted]

Other courts, whose approach we reject, have not noted or have ignored the distinction which we find renders a subsequent warning inadmissible, and have held to the contrary. [citations omitted]

The facts of this case present the converse of the rationale applied in *Chart, supra, because the duty to warn emphasizes the conduct of the manufacturer rather than the character of the product.* Accordingly, Rule 904.07, Stats., prevents the use of subsequent remedial measures to prove that the conduct of the manufacturer in failing to give an adequate warning was culpable in the first instance. The trial court correctly held that the subsequent warning in the 1979 owner's manual was inadmissible." [6] (Emphasis added) 311 N.W.2d at 223–224.

The trial court did not err in granting the motion in limine and in striking the testimony of Dr. McCarthy.

The directed verdict on the issue of strict liability for a design defect is vacated and set aside and the case is remanded for a new trial on that issue only. The case is affirmed in all other respects.

HATHAWAY and BIRDSALL, JJ., concur.

6. See also *Cann v. Ford Motor Company,* 658 F.2d 54 (2nd Cir.1981); *Lindsay v. Ortho Phar-* *maceutical Corporation,* 637 F.2d 87 (2nd Cir. 1980).